BERGEN PINES COUNTY HOSPITAL, PETITIONER-RESPON-DENT, v. NEW JERSEY DEPARTMENT OF HUMAN SERVIC-ES; ANN KLEIN, COMMISSIONER; NEW JERSEY DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES; THOM-AS M. RUSSO, DIRECTOR; NEW JERSEY DEPARTMENT OF HEALTH; JOANNE E. FINLEY, M.D., COMMISSIONER; NEW JERSEY DIVISION OF HEALTH ECONOMICS; JAMES HUB, DIRECTOR, RESPONDENTS-APPELLANTS.

Argued March 5, 1984—Decided June 28, 1984.

458

460

*Ivan J. Punchatz,* Deputy Attorney General, argued the cause for appellants (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Louis L. D'Arminio* argued the cause for respondent (*Breslin, Herten & LePore,* attorneys).

The opinion of the Court was delivered by

**SCHREIBER, J.**

The central issue in this case is whether a party who, though on notice of a proposed regulation, elects not to participate in the proceedings leading to adoption of the regulation may years later introduce evidence to attack the factual predicate of the regulation. This issue arose in a factual context in which plaintiff, Bergen Pines County Hospital (BPCH), questioned, among other things, the validity of regulations prescribing the methodology that was used to fix the rates paid to it for caring for medicaid patients in its long-term medical care facility. The Appellate Division remanded the proceedings to the Department of Health for submission of evidential proof and findings of fact justifying the regulations. The remand was also for the purpose of developing a record on several other items. We granted the Attorney General's motion for leave to appeal from that part of the Appellate Division order concerning the promulgation of "regulations governing the reimbursement of long term care facilities under the Medicaid program." The Attorney General has made it clear that his objection was to the attack that the regulations were arbitrary.

I

A

The procedural history of this case is complicated and intricate. Plaintiff, a health care facility owned and operated by Bergen County, has contested the rates fixed by the Department of Human Services, Division of Medical Assistance and Health Services (DMAHS), to be paid to BPCH for medicaid recipients who had been housed and maintained in BPCH's long-term care facilities [1] during periods between July 1, 1976

---

[1] A long-term care facility "means a Skilled Nursing Facility * * * and/or an Intermediate Care Facility * * * which exists as a free-standing institution or an identifiable part of an institution and which meets all the State and

and June 30, 1981. BPCH's appeal for rate relief for periods prior to January 1, 1978 was denied by the Appellate Division because that appeal had been filed more than two-and-one-half years after the rates for those periods had been fixed. Those appeals were well beyond the 45 days within which the appeals should have been taken. *R.* 2:4–1(b). We denied BPCH's petition for certification to review that decision. However, the Appellate Division remanded several matters to the Department of Health for further hearings and fact findings concerning the rates applicable to periods commencing January 1, 1978. It is to be noted that DMAHS used a different method to fix rates after December, 1977, known as CARE (Cost Accounting and Rate Evaluation). The Attorney General's motion for leave to appeal concerned primarily the attack on the regulations. The issues before us relate only to the methodology prescribed in the regulations for determining rates to be paid on and after January 1, 1978.

Medicaid, Title XIX of the federal Social Security Act (Act), is a shared federal-state program under which the federal government contributes money to defray part of the cost of a broad range of services including long-term nursing care in appropriate facilities for eligible patients. Medicaid covers welfare recipients who come within one of the federal categories—aged, blind, or disabled persons, or families with children deprived of parental support. 42 *U.S.C.A.* §§ 1396a(a)(10)(A)(i) (West 1983). At their option, states may expand the category of eligible persons. *Id.* § 1396a(a)(10)(A)(ii).

The Act prescribes numerous terms and conditions that the state must satisfy in order to qualify for the federal financial aid. One crucial condition is the existence of a state plan that, among other things, prescribes the manner in which rates for long-term nursing care for recipients of medicaid are to be

Federal requirements for New Jersey Medicaid Program participation" as described in the New Jersey regulations. *N.J.A.C.* 10:63–1.2.

calculated. *Id.* § 1396a(a)(13). Each state's plan must be approved by the Secretary of Health, Education and Welfare [2] (Secretary). *Id.* §§ 1396, 1396a(b). The method in the state plan is then applied to each institution providing services to medicaid patients and payments are made accordingly.

The Act was amended in 1972 stating that, effective July 1, 1976,[3] state plans were to provide "for payment of the skilled nursing facility and intermediate care-facility services provided under the plan on a *reasonable cost related basis*, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost-finding methods approved and verified by the Secretary [of HEW]." 42 *U.S. C.A.* § 1396a(a)(13)(E) (West 1976).[4] (Emphasis supplied).

Before this amendment many states had elected to reimburse nursing homes on a flat-rate basis so that some nursing homes were being overpaid, while others were "paid too little to support the quality of care that medicaid patients" were expected to need and receive. *S.Rep.* No. 92–1230, 92d Cong., 2d Sess. 287 (1972). Overpayment permitted reimbursement of expenses for unnecessary items such as luxury services, and created little incentive to employ the most efficient and econom-

---

[2]Congress redesignated the Department as the Department of Health and Human Services effective as of May 4, 1980. 20 *U.S.C.A.* § 3508 (West Supp.1984). As all agency acts relevant to this appeal predated the redesignation, this opinion refers to the federal agency as HEW.

[3]The Secretary of HEW extended the effective date by regulation to January 1, 1978. 41 Fed.Reg. 27,300, 27,306 (1976). *But see Alabama Nursing Home Ass'n v. Califano,* 433 *F.Supp.* 1325, 1330–31 (M.D.Ala.1977) (holding regulation invalid because effective date prescribed by statute to be July 1, 1976), reh'g on other grounds, 465 *F.Supp.* 1183 (M.D.Ala.1979), rev'd on other grounds, 617 *F.*2d 388 (5th Cir.1980).

[4]In 1981 subparagraph (E) was redesignated as (A) and amended, Pub.L. No. 97–35, § 2173(a)(1)(B), (C) (1981), to provide for reimbursement rates which "are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 *U.S.C.A.* § 1396a(a)(13)(A) (West 1983).

ical methods, "with the result that the State's Medicaid dollars [did] not go as far as they could to provide needed medical care." 41 Fed.Reg. 27,300 (1976). It was to ameliorate these problems that Congress enacted the amendment. Underpayment placed economic pressure on facilities to provide lower quality care, to compel non-medicaid patients to subsidize the cost of caring for medicaid patients, or to refuse to accept medicaid patients. *Id.*

Subject to the limitation that a reasonable cost-related basis be central to the rate guidelines, Congress contemplated that the states would have flexibility to develop methodologies to determine the costs of all elements that constitute the care rendered to the medicaid patient and to determine reasonable cost-related reimbursement for that care. *S.Rep., supra,* at 287. HEW has stated that Congress' intent was that "[s]tates have great flexibility in determining classes in setting class rates, as long as their criteria and rates are reasonable." 41 Fed.Reg. 27,304 (1976).

The Secretary's regulations implementing the amendment provided that the state plan must not result in payment rates "lower than rates that the [state] agency reasonably finds to be adequate to reimburse in full the actual allowable costs of a facility that is economically and efficiently run." 42 *C.F.R.* § 447.302(b) (1978). The Secretary, as noted above, was also required to review and approve a state's cost-finding, rate-setting, and reimbursement methodologies to assure compliance with this standard. *See Alabama Nursing Home Ass'n v. Harris,* 617 *F.*2d 388, 394 (5th Cir.1980); *S.Rep., supra,* at 287 ("The methods would have to be approved and validated by the Secretary.").

Reimbursement on a reasonable cost-related basis does not mean that each facility will be paid its actual costs. The legislative history makes clear that states may set their payment rates at a level that would reimburse institutions only for those costs that the state finds reasonable. The *Senate Report*

declared that reasonable cost-related methodology, for example, could be determined on "a geographical basis, a class basis, or on an institution-by-institution basis." *S.Rep., supra,* at 287–88. The Secretary has acknowledged that:

An efficiently operated facility that provides services under the plan at a cost less than the class rate will in effect make a profit equal to the difference. On the other hand, a facility that is not economically operated may incur actual costs of more than the class rate; thus, a class rate can be used as an incentive for efficiency and economy. [41 Fed.Reg. 27,300, 27,304 (1976).]

## B

New Jersey entered the medicaid program following passage of the Medical Assistance and Health Services Act (the New Jersey Act). *N.J.S.A.* 30:4D–1 to –19. A primary stated purpose of the New Jersey Act was "to obtain all benefits for medical assistance provided by the Federal Social Security Act" for those whose "resources are determined to be inadequate to secure quality medical care at their own expense." *N.J.S.A.* 30:4D–2.

The New Jersey Act established DMAHS within the Department of Human Services as the "single State agency" obligated to perform the administrative functions required for participation in the medicaid program through the promulgation of rules and regulations. *N.J.S.A.* 30:4D–4, –5. The New Jersey Act requires DMAHS to pay for medical assistance, including authorized nursing or intermediate care facility services, to qualified applicants. *N.J.S.A.* 30:4D–6. DMAHS was also authorized to pay for these services to the extent permitted by the New Jersey Act and the rules and regulations promulgated thereunder. *N.J.S.A.* 30:4D–6c.

The Commissioner of the Department of Human Services is authorized to submit to the Secretary of HEW "a plan for medical assistance [including a method for setting reimbursement rates], as required by" the federal law. *N.J.S.A.* 30:4D–7a. The Commissioner issues or may cause DMAHS to issue rules, regulations, and administrative orders "to secure for the

State of New Jersey the maximum Federal participation that is available with respect to a program of medical assistance, consistent with fiscal responsibility and within the limits of funds available for any fiscal year, and to the extent authorized by the medical assistance program plan." *N.J.S.A.* 30:4D–7.

## C

The rules and regulations setting forth reimbursement procedures and methodology for long-term care facilities (LTCFs) at issue in this case, the so-called CARE system, were properly adopted in accordance with the Administrative Procedure Act and specified a methodology to comply with the federal requirements of a "reasonable cost related" basis. *N.J.A.C.* 10:63 subch. 3 Foreword.[5] These guidelines had been developed jointly by the Department of Health and the Department of Human Services. *N.J.A.C.* 10:63 subch. 3 Foreword. It was the opinion of both departments

> that the strict application of these guidelines will generally produce equitable rates for the payment of long-term care facilities (LTCF's) of the reasonable cost of providing routine patient care services. The departments recognize however, that no set of guidelines can be developed which might not result in some inequities if applied rigidly and indiscriminately in all situations. Inequities could be in the form of rates that are unduly low or rates that are unduly high.
>
> Accordingly, in the case where a LTCF believes that, owing to an unusual situation, the application of these guidelines results in an inequity, the departments are prepared to review the particular circumstances with the LTCF. Appeals on the grounds of inequity should be limited to circumstances peculiar to the LTCF affected. They should not address the broader aspects of the guidelines themselves. [*Id.*]

Under the guidelines, reimbursement rates are determined by applying the lower of historical costs or screened rates. Histor-

---

[5]The Commissioner's regulations in subchapter 3 have been amended a number of times since December 29, 1977, when the revised subchapter relevant to this appeal became effective. Unless otherwise indicated, all references from this point on in this opinion are to the regulations as they stood at the end of 1977, before the series of amendments beginning in January, 1980, which are embodied in the current *New Jersey Administrative Code.*

ical costs are defined as the actual costs incurred during a base period by the particular LTCF whose reimbursement rates are being developed. A return on net equity for proprietary facilities is included in this calculation. *N.J.A.C.* 10:63–3.9(a)(6).

The historical costs are calculated in six basic areas: raw food costs, general service expenses; property-operating costs, amortization of special expenditures, patient-care expenses, and property-capital costs (including return on investment). *N.J. A.C.* 10:63–3.2(a). After the historical costs of each LTCF are determined, the medians in each of the six categories are found in each group.

Screened costs are predicated on these median expenses for all LTCFs falling within a class or group. LTCFs are grouped geographically, relying in part on location factors (metropolitan, suburban, and rural). *N.J.A.C.* 10:63–3.3(a)(3)(i). The regulations detail divers other refinements. LTCFs owned and operated by the state and counties and all those with less than 20% medicaid occupancy are excluded in determining five of the six screened costs. A percentage variation is added to the median, which then is the screened rate. The historical cost of an institution and the screened rate in each category are compared, and the lower figure applied. *N.J.A.C.* 10:63–3.2(a).

D

The main issue in this case centers on the exclusion of LTCFs owned and operated by the state and counties in calculating five of the screened rates. BPCH also has charged that there were specific incorrect calculations and data used in determining its historical costs. DMAHS regulations provided for departmental review of such matters, but not for review of items that encompassed "policy implications" or matters of "broad applicability." *N.J.A.C.* 10:63–3.20(a)(1). In accordance with these regulations, plaintiff protested the issues concerning its historical costs in an initial appeal, designated Level I, to

analysts of the Department of Health.[6]   *N.J.A.C.* 10:63–3.-20(a)(1).   Being unsuccessful, plaintiff sought further review in a Level II hearing before a panel of designated representatives of the Department of Health and DMAHS, whose recommendations were submitted to the Director of DMAHS for final decision.   *N.J.A.C.* 10:63–3.20(a)(2).[7]   Plaintiff, BPCH, though receiving some relief, appealed on November 17, 1980 to the Appellate Division pursuant to Rule 2:4–1.   It was at that stage, more than two-and-one-half years after the rules were promulgated, that plaintiff first properly raised the broad issue of the asserted impropriety of excluding governmentally-owned facilities in computing screened costs.

In discussing BPCH's claim that it was unreasonable to exclude county and state nursing home facilities in determining screened rates and that the rate-setting methodology therefore should not have excluded costs of governmental facilities, the Appellate Division observed that plaintiff had presented on the appeal a substantial number of documents and affidavits to support its position.   However, it concluded that the record did not provide an adequate basis upon which to resolve the issue and remanded the matter to the Department of Health for a full contested hearing at which the parties would have an opportunity to present and rebut proofs.   The Department was instructed to "make specific findings and conclusions as to whether DMAHS was justified in excluding the reported expenses of State and county nursing homes from the CARE guidelines and whether the CARE system represented a 'reasonable cost related' method of reimbursement."   The Appellate Division also held that plaintiff should be afforded an

---

[6]The Level I appeal is now heard by analysts from the Department of Health and, "as required," by supervisory-level representatives from the Department of Health and Department of Human Services.   14 *N.J.R.* 269(a) (1982), 15 *N.J.R.* 156(a) (1983).

[7]Now the Level II hearing at the request of an LTCF may be before an administrative law judge.   *Id.*

opportunity on the remand to present evidence on the other assignments of error concerning historical costs. Upon conclusion of the hearing and receipt of the Department's decision, including specific findings and conclusions, the parties were to file supplemental briefs with the Appellate Division, which retained jurisdiction.

The Attorney General moved for leave to appeal from that portion of the Appellate Division's order that remanded "the appeal of Bergen Pines County Hospital from the promulgation of the regulations governing the reimbursement of long term care facilities under the Medicaid program, *N.J.A.C.* 10:63–1 *et seq.*, to the Department of Health." We granted the Attorney General's motion, and now reverse that part of the Appellate Division's order. To that extent the Appellate Division's order of remand is modified.

## II

■ Plaintiff argues that its attack on the soundness of the regulations should be remanded for a hearing to enable it to explore through discovery and testimony the full reasoning behind DMAHS's decision to omit costs of governmental LTCFs from the screening medians and to present evidence to demonstrate that the factual basis for the agency's regulations is wanting. We believe that, under the singular circumstances here, a remand for that purpose is not warranted.

The regulations, prescribing the methodology to be used to determine the rates to be paid for LTCFs, *N.J.A.C.* 10:63–3.1 to –3.21, were duly adopted in accordance with the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15, and the Rules of Administrative Procedure promulgated by the Director of the Division of Administrative Procedure,[8] *N.J.S.A.* 52:14B–7(g). In accordance with that Act, *N.J.S.A.* 52:14B–4(a)(1), and the

---

[8]The Division's functions, powers, and duties were transferred in 1981 to the Office of Administrative Law. *N.J.S.A.* 52:14F–2.

Rules, *N.J.A.C.* 15:15–4.1(a) (current version at *N.J.A.C.* 1:30–3.-1(a)(1)), notice was given to the public, including plaintiff, of the proposed regulations. 9 *N.J.R.* 332(b) (1977).

All interested persons were afforded a reasonable opportunity "to submit data, views, or arguments" respecting the proposed rule. *N.J.S.A.* 52:14B–4(a)(2) (current version at *N.J.S.A.* 52:14B–4(a)(3)). Thus BPCH could have presented evidence at that time to that forum in support of the position it now asserts—that costs of state and county institutions should have been included in fixing the screened costs in the five components, raw food costs (*N.J.A.C.* 10:63–3.4(a)), general service expenses (*N.J.A.C.* 63–3.5(a)(1)), property-operating expenses (*N.J.A.C.* 10:63–3.8(a)(2)(i)), routine patient care expenses (*N.J.A.C.* 10:63–3.8(b)), and property-capital costs (*N.J.A.C.* 10:63–3.-10(c), (d)).

The cost-related basis approach to rate fixing had been forecast for some time. Congress had presaged a change when it was considering and then when it enacted the amendment to the Social Security Act in 1972. *S.Rep., supra,* at 287–88. In 1976 HEW, after notice to the public, 41 Fed.Reg. 15,560 (1976), considered and adopted its regulations to further the ends of the new law. 41 Fed.Reg. 27,300 (1976).

Locally, on July 7, 1976, DMAHS held a conference attended by representatives of county-owned LTCFs. The purpose of the conference was to discuss how county institutions would be affected by the system, then in effect, "of reimbursing providers of LTCF services on a 'reasonable, cost-related basis.'" That system, like the present CARE system, excluded governmental LTCFs from the reimbursement formula. Plaintiff had a representative at that meeting and was fully alerted to the problem at that time. The Nursing Home Study Commission, chaired by then Senator Fay, had caused a number of studies to be made in 1977 relating to nursing homes and medicaid reimbursement. One study, *An Analysis of Medicaid Nursing Home Reimbursement,* prepared by the Office of Fiscal Af-

fairs (*Analysis*), referred to the proposed formula developed by DMAHS and the Department of Health in 1977. That proposed formula excluded costs of governmental LTCFs in determining a reasonable cost basis. *Analysis* at 29.

Indeed, plaintiff does not dispute the fact that it was offered an opportunity to present whatever relevant evidence it desired at the time the proposed regulations were being considered. Nor does plaintiff claim that the evidence was unavailable at that time. Plaintiff does not assert that it was denied the opportunity of examining the information before DMAHS (much of which appears in the *Analysis*) or producing rebuttal evidence.[9]

Although the hearings concerning the proposed guidelines were held in July, 1977, 9 *N.J.R.* 332(b) (1977), plaintiff did not file its notice of appeal until November, 1980. It sought not only prospective relief, but also an additional payment of over $7,000,000 for the period from January 1, 1978 to November, 1980. Many events had occurred in the interim.[10] The funding for the program had been established for all qualified LTCFs in

---

[9]The Administrative Procedure Act provides that a proceeding to contest any rule on the ground of noncompliance with the procedural requirements of notice of "the time when, the place where, and the manner in which interested persons may present their views" must be made within one year from the effective date of the rule. *N.J.S.A.* 52:14B–4(d). The plaintiff makes no claim that these procedural requirements were not satisfied. Indeed, its attack is well beyond the one-year limitation period.

[10]We note in passing that under Rule 2:4–1(b) appeals "from final decisions or actions of state administrative agencies shall be taken within 45 days from the date of * * * notice of the action taken." Generally the 45-day time limitation does not apply to an attack on the validity of a rule. Compare Rule 2:4–1(b) as proposed in 1966, in which reference was made expressly to a review of the validity of any rules within the 45-day period and which was not adopted, with the enacted Rule, which contains no such reference. We do not pass upon the question of whether the 45-day period should apply when adjudicative rulemaking is involved and the aggrieved party or parties participate or could have participated in the proceeding. *See Cunningham v. Department of Civil Serv.,* 69 *N.J.* 13, 20–24 (1975).

the state and had been applied to those institutions for more than two-and-a-half years before the appeal was filed. It is to be remembered that medicaid is a welfare assistance program of limited funds contributed to jointly by the federal and state governments. Monies have been raised and payments made to LTCFs whose rates had been calculated in accordance with the approved state guidelines embodied in the regulations.

Studies demonstrate that if the costs of county and state-owned homes and those homes with medicaid populations of less than 20% had been included in calculating the screened rates, the additional annual costs for calendar year 1980 would have exceeded $9,000,000, of which $3,259,000 would have been paid to proprietary, $1,423,000 to private nonprofit, and $4,390,-000 to governmentally owned facilities. The availability and quality of long-term care services already rendered to the medicaid population would not have been increased by retroactive reimbursement, and there would be unneeded expenditures of scarce medicaid funds by paying additional sums to the most inefficient proprietary (investor owned) and voluntary (nonprofit) facilities. These figures would be substantially greater for the entire period in question from January 1, 1978 to November, 1980. Thus, the financial impact on the State of retroactive payment would be severe.

Moreover, the State's ability to obtain the federal share for past periods is doubtful. This is because plaintiff is seeking in effect a retroactive amendment to the State plan. The Social Security Act restricts restitution to those situations in which an aggrieved party has acted within certain prescribed time periods. 42 *U.S.C.A.* § 1316(a), (c) (West 1983). None of these has been met here. Further, reconsideration first must be sought from the Secretary of HEW. *Id.* § 1316(a)(2). That has not been done. Indeed, any modification of the federally-approved plan would necessitate a direction to the Secretary, who is not a party to the state proceedings.

■ Insofar as prospectivity is concerned, any amendment to the State plan would require the Secretary's approval. 45 *C.F.R.* §§ 201.3(f), 201.6(a), 205.5 (1983). If the amendment is not approved, it is our understanding that the Secretary will not permit any increased payments ascribable to the amendment to be made until the amendment complies with federal standards. 48 Fed.Reg. 56,057, 56,058 (to be codified at 42 *C.F.R.* 447.-253(f)); 45 *C.F.R.* §§ 201.5, 205.5(b) (1983). Approval of an amendment should not be assumed.

This is illustrated by what occurred when DMAHS in October, 1978 investigated the possibility of establishing a separate peer grouping for county facilities. HEW advised DMAHS that it was permissible to create a separate classification for county facilities. However, the State Department of Health questioned the notion since there was "nothing to indicate a uniqueness in patient care that warrants exclusion from an operating cost evaluation along with facilities under other forms of organization." Nevertheless, the proposal was submitted to HEW. There followed a series of letters in which HEW indicated there was an insufficient factual basis to support a separate classification for government owned facilities. Sometime after August 8, 1980 the County Welfare Administrators, including Bergen County, were requested to furnish back-up data. None were forthcoming and the State plan was not amended.

DMAHS is in the process of proposing an amendment to the plan to place county nursing facilities in a separate peer grouping for ratemaking purposes. We were informed at oral argument that a study was being made to ascertain whether such a proposal may be supported. Any amendment would have to be submitted to HEW for its approval.

Alternatively, the plaintiff contends that the courts, rather than the agency, should consider and decide the question on the basis of the additional information it has furnished on this

appeal. This contention suffers from another infirmity not previously discussed.

■■ The basic purpose of establishing agencies to consider and promulgate rules is to delegate the primary authority of implementing policy in a specialized area to governmental bodies with the staff, resources, and expertise to understand and solve those specialized problems. The rulemaking procedures set forth in the Administrative Procedure Act, *N.J.S.A.* 52:14B-1 to -15, are designed to take advantage of the agencies' resources and expertise. The Administrative Procedure Act specifically provides that the agency should publish a notice of its proposed rules and invite comments from the public and all interested parties, which the agency must consider in weighing the wisdom of the proposed rule or in refashioning the rule. *N.J.S.A.* 52:14B-4(a). The agency is particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that such a notice of proposed rulemaking would invite.

■ To permit a party in court to raise objections to a rule and to submit evidence concerning those objections that it failed to raise before the administrative agency at the appropriate time would be to undermine the very purpose of administrative agencies. In addition, it would force courts to review potentially overwhelming reams of technical data and to resolve from scratch issues as to which it does not have particular expertise. Finally, it would permit a party who fostered an inadequate rulemaking record by his own omission to take advantage of the inadequacy of the factual record in order to secure *de novo* review of the wisdom of the rule.

Professor Schwartz, in his text on administrative law, has written:

> One may go further and say there is not only a right but a duty to present all relevant evidence before the agency. The fundamental principle is that issues and evidence available to the individual must be raised before the agency or the right to raise them is waived. * * * The whole scheme of the statute setting

up the agency * * * would be defeated if a party could go into court and present his evidence for the first time there.

    \*       \*       \*       \*       \*       \*       \*       \*

> Not only is review restricted to the administrative record, it is also limited to the issues raised before the agency. Both orderly procedure and good administration require that objections to agency proceedings be made while the agency has opportunity for correction. Any issue not raised at the administrative level may not be considered on review. "A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action." [B. Schwartz, *Administrative Law* §§ 114, 206 (1976) (quoting *Unemployment Compensation Comm'n v. Aragon*, 329 *U.S.* 143, 155, 67 *S.Ct.* 245, 251, 91 *L.Ed.* 136, 146 (1946)) (footnotes omitted).]

Although Professor Schwartz was writing in the context of administrative adjudications, the same principles are equally applicable in rulemaking. *See Environmental Defense Fund v. Environmental Protection Agency*, 598 *F.*2d 62, 91 (D.C.Cir. 1978) (because one petitioner failed to participate in EPA's proceedings leading up to the promulgation of rules on a toxic substance, "its petition must be dismissed"); *Nader v. Nuclear Regulatory Comm'n*, 513 *F.*2d 1045, 1055 (D.C.Cir.1975) ("those who refrain from participation in rulemaking proceedings may not obtain direct judicial review of the regulations resulting") (footnote omitted); *Portland Cement Ass'n v. Ruckelshaus*, 486 *F.*2d 375, 394 (D.C.Cir.1973) (ordinarily "[c]hallenges to standards [in rules] must be limited to points made by petitioners in agency proceedings. To entertain comments made for the first time before this court would be destructive of a meaningful administrative process."), *cert.* denied, 417 *U.S.* 921, 94 *S.Ct.* 2628, 41 *L.Ed.*2d 226 (1974); *cf. National Ass'n of Metal Finishers v. Environmental Protection Agency*, 719 *F.*2d 624, 638 (3d Cir.1983) (if petitioner fails to comment after adequate notice and opportunity to comment, petitioner "will have less latitude in its complaints * * * or in special circumstances will be barred altogether"); *Union Oil Co. of California v. United States Dep't of Energy*, 688 *F.*2d 797, 814 n.31 (Temp.Emer.Ct.App.1982) (petitioner "is preclud-

ed from collaterally attacking the record by reason of its failure to participate in the rulemaking"), *cert.* denied, 459 *U.S.* 1202, 103 *S.Ct.* 1186, 75 *L.Ed.*2d 433 (1983); *D.C. Transit Sys., Inc. v. Washington Metropolitan Area Transit Comm'n,* 429 *F.*2d 197 (D.C.Cir.1970) (by negative inference approving an estoppel argument where, in a licensing proceeding, petitioner did not state the position it ultimately adopted before the reviewing court); *Minnesota Public Interest Research Group v. Butz,* 358 *F.Supp.* 584, 619 (D.Minn.1973) (laches can be applied to agency actions under federal environmental laws and regulations), aff'd, 498 *F.*2d 1314, 1324 (8th Cir.1974), motion to expedite appeal denied, 508 *F.*2d 892 (8th Cir.), reh'g on other grounds, 401 *F.Supp.* 1276 (D.Minn.1975), rev'd on other grounds, 541 *F.*2d 1292 (8th Cir.), stay denied, 429 *U.S.* 935, 97 *S.Ct.* 347, 50 L.Ed.2d 304 (1976). By not presenting its position to the agency, plaintiff may foster a rulemaking record that does not necessarily cover its objections. *See Gage v. United States Atomic Energy Comm'n,* 479 *F.*2d 1214, 1219 (D.C.Cir. 1973) (by failing to participate in agency proceeding, petitioner probably precluded the "compilation of a record adequate for judicial review of the specific claims he has reserved"); *National Welfare Rights Org. v. Finch,* 429 *F.*2d 725, 736–37 (D.C.Cir. 1970) (intervention by welfare recipients organization in a hearing conducted by the Secretary as to the conformity of a state plan with federal statutory mandates to be encouraged as a means of strengthening judicial review).

In summary, plaintiff should not be permitted to take advantage of its negligence or tactic to upset a rule relied upon by other parties. DMAHS promulgated its rate guidelines on the basis of the information before it. In the years since the effective date of the regulations the State, as well as HEW, has relied on the CARE system in reimbursing LTCFs. Plaintiff should not now be heard to raise issues that it chose not to raise in the DMAHS proceedings.

## III

Traditionally the judicial scope of review of an administrative rule is whether that rule is arbitrary or capricious. Put another way, is the rule unreasonable or irrational? Agency regulations are accorded presumptions of validity and reasonableness. *Newark v. Natural Resource Council*, 82 *N.J.* 530, 539–40, *cert.* denied, 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980); *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 561 (1978); *Flanagan v. Civil Serv. Dep't*, 29 *N.J.* 1, 12 (1959). The burden is on the plaintiff to overcome these presumptions.

If the establishment of the guidelines in 1977 had constituted an administrative adjudication, rather than simply rulemaking, DMAHS would have had to make factual findings to support its conclusions, which would be subject to judicial review. *See Bally Mfg. Corp. v. N.J. Casino Control Comm'n*, 85 *N.J.* 325, 345–46 (Handler, J., concurring), 348 (Pashman, J., dissenting), appeal dismissed for want of a substantial federal question, 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L.Ed.*2d 74 (1981); *In re William B. Kessler Mem'l Hosp.*, 78 *N.J.* 564, 577–78 (1979) (Handler, J., concurring); *Cunningham v. Department of Civil Serv.*, 69 *N.J.* 13, 22 n.3 (1975). Plaintiff concedes that its challenge is to an administrative rule in contrast to an adjudication fixing its rates. We have accepted that position.

The plaintiff has not shown that DMAHS acted arbitrarily and unreasonably. The presumptions of validity and reasonableness have not been overcome.

We believe there was an adequate rational basis for the DMAHS regulations. At the time DMAHS was considering formal adoption of the regulations it had before it a special study, entitled *An Analysis of Medicaid Nursing Home Reimbursement, supra,* prepared for Senator Fay's Nursing Home Study Commission. This study explained that county and state

institutions had been excluded in the pre-CARE plan and were to be excluded in the CARE plan in computing the screening medians for several reasons. First, it was difficult to allocate accurately their costs to the specific categories. According to the study, the experience of the DMAHS Bureau of Audits indicated that the cost allocations used generally by the county were unreliable. *Analysis, supra,* at 29, 83. Here the plaintiff, for example, maintains and operates a hospital in connection with its LTCF and care must be exercised to make certain that the LTCF is assessed only its proper cost.[11] Second, as a group, governmental institutions have higher costs than both proprietary and voluntary LTCFs, *id.* at 29, and DMAHS and the Health Economics Services of the Department of Health have found that some of these higher costs were unreasonable. The agency was persuaded for these reasons to make the decision that it did. Since the reimbursement rates of health care facilities are within the peculiar competence of the agency that promulgated the rules and not the special competence of the courts, we must accord substantial deference to the administrative determinations. *N.J. Telephone Co. v. State,* 162 *N.J.Super.* 60, 77 (App.Div.1978); *Cooley's Anemia Blood & Research Foundation v. Legalized Games of Chance Control Comm'n,* 78 *N.J.Super.* 128, 140 (App.Div.), certif. denied, 40 *N.J.* 212 (1963); *Natural Resources Defense Council v. SEC.,* 606 *F.*2d 1031, 1052 (D.C.Cir.1979). Furthermore, the methodology had been specifically approved by HEW, so that the plan complies with applicable federal statutory and regulatory requirements. This approval, too, is entitled to substantial deference. *Monmouth Medical Center v. State,* 80 *N.J.* 299, 317 (Schreiber, J., dissenting), *cert.* denied, 444 *U.S.* 942, 100 *S.Ct.* 297, 62 *L.Ed.*2d 308 (1979); *Illinois Council for Long Term Care v. Miller,* 503 *F.Supp.* 1091, 1094–95 (N.D.Ill.1980).

---

[11]Rates for hospital services are also reimbursed, but on a different basis. *N.J.A.C.* 10:52–1.1 to –1.19 (1984).

Plaintiff's underlying assumption that it is entitled to its actual costs is, as we have seen, misplaced. *Minnesota Ass'n of Health Care Facilities v. Minnesota Dep't of Public Welfare*, 602 *F.*2d 150, 153 (8th Cir.1979); *Illinois Council for Long Term Care v. Miller, supra*, 503 *F.Supp.* at 1095; *Indiana Dep't of Public Welfare v. Crescent Manor*, 416 *N.E.*2d 470, 476 (Ind.App.1981). The legislatures, federal and state, envisaged economically responsible reimbursement on a reasonable cost-related basis. Reimbursement is premised upon reasonableness, not actual cost. Any deficiency, of course, must be borne by the governmental body involved, in this case Bergen County. Though Bergen County residents and taxpayers make this contribution, it is for the benefit of other Bergen County residents. Plaintiff's facility is maintained only for the residents of that county.

## IV

As previously observed, the federal Social Security Act obligates the Secretary to approve and verify the methods used in the State's plan. The Secretary must find that the State's rate-setting methodology is satisfactory. 42 *U.S.C.A.* § 1396a(a)(13)(E) (West 1976). *See S.Rep., supra*, at 287. HEW has acknowledged this duty:

> The language of the Committee Report makes clear that *the State's methodologies for rate-setting, as well as the State's methods for cost-finding, are subject to the Secretary's approval.*
>
>   *   *   *   *   *   *   *   *
>
> In light of the concern expressed in the legislative history of section [1396a(a)(13)(E)] about the dangers to the objectives of the Medicaid statute of either underpayment or overpayment of long-term care facilities, *the Secretary [of HEW], in carrying out his statutory functions of reviewing, approving, and verifying the States' methodologies, has the responsibility to seek to assure that the methodologies will in fact result in reasonable cost-related reimbursement.* [41 Fed.Reg. at 27,300 (1976) (emphasis supplied).]

In accordance with the statute, the State plan that is embodied in the regulations now under attack had prior to its adoption been submitted to the Secretary of HEW for approval. The

plan originally submitted was revised in accordance with HEW's suggestions and was resubmitted on September 20, 1977. As the Regional Medicaid Director of HEW noted, it had been "a lengthy process."

Since an amendment to the State's plan could not be effectuated without the Secretary's approval, it would appear that the Secretary is a proper, if not necessary, party to a proceeding seeking a change in the State's reimbursement plan. It is doubtful if the plaintiff could secure effective relief without the Secretary's presence. We note that in other comparable cases the Secretary has been made a party defendant. *E.g., Alabama Nursing Home Ass'n v. Harris*, 617 *F.*2d 388 (5th Cir.1980); *California Hospital Ass'n v. Schweiker*, 559 *F.Supp.* 110 (C.D.Calif.1982), aff'd *sub nom. Sutter Community Hospitals of Sacramento v. State Dept. of Health Services*, 705 *F.*2d 468 (9th Cir.1983). Neither party has raised or briefed the issue of joinder, and we choose not to pass on it.

## V

There remains for consideration the Appellate Division's remand of the issues on matters other than the validity of the regulations. The remand was to the Department of Health. The pertinent statutory provisions, however, vest the fixing of medicaid reimbursement rates and fees in DMAHS. *N.J.S.A.* 30:4D–6c, –7b, and –7c. This scheme complies with the federal requirement that a "single state agency" be responsible for administering the medicaid program. 42 *U.S.C.A.* § 1396a(a)(5). *See N.J. Atty.Gen.Op.* Formal Opinion No. 8–1976 (1976) (opining that the Commissioner of Institutions and Agencies rather than the Commissioner of Health has "the specific and exclusive authority to establish reasonable rates of reimbursement for * * * health care services provided to a Medicaid recipient"). Indeed, the setting of medicaid rates is specifically excluded from the statutory responsibilities of the Department of Health. *N.J.S.A.* 26:2H–18b, –18c. Though the

Department of Health is utilized to process cost studies, the issuance of the rates and policy determinations are made by DMAHS. The remand on the remaining issues therefore should have been to DMAHS.

While this appeal was pending, the Commissioner of Human Services modified the appellate procedure. The Level II proceeding within the agency has been eliminated. Contested matters on appeal from a Level I proceeding are now transmitted by DMAHS to the Office of Administrative Law (OAL). *See N.J.A.C.* 10:63–3.20 (1984). Accordingly, the remand here should be to DMAHS for transmittal to the OAL.

Modified.

*For modification* —Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed* —None.