**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4347-16T4

IN THE MATTER OF
HAWTHORNE BOROUGH,
PASSAIC COUNTY GOFFLE
PARK SYNTHETIC TURF
FIELD GOFFLE BROOK PARK
(SR: 8/29/2002).

_____

BOARD OF CHOSEN FREEHOLDERS
OF THE COUNTY OF PASSAIC,

     Intervenor-Respondent.

_____

Submitted December 19, 2018 – Decided April 8, 2019

Before Judges Fuentes and Moynihan.

On appeal from the New Jersey Department of Environmental Protection.

Michael J. Pasquale, attorney for appellant Borough of Hawthorne.

William J. Pascrell, III, Passaic County Counsel, attorney for respondent Board of Chosen Freeholders of the County of Passaic (John D. Pogorelec, Jr., Assistant County Counsel, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Department of Environmental Protection (Melissa H. Raksa, Assistant Attorney General, of counsel; John P. Kuehne, Deputy Attorney General, on the brief).

PER CURIAM

The Borough of Hawthorne appeals from the final decision of the Commissioner of the Department of Environmental Protection (Department), made by the Assistant Commissioner for Natural and Historic Resources, authorizing the installation of a synthetic turf field in Goffle Brook Park, which is owned by intervenor County of Passaic. Hawthorne contends the Commissioner's decision was arbitrary and capricious. We disagree and affirm.

The park has been listed on both the New Jersey and National Register of Historic Places since 2002. As such, when the County sought to install a synthetic turf sports field in the park, it contacted the Historic Preservation Office (Office), an arm of the Department responsible "for maintaining the New Jersey Register of Historic Places and administering the State Historic Preservation Program." N.J.A.C. 7:4-1.3. The Office determined the proposed project would be an encroachment.[1] N.J.A.C. 7:4-1.3; 7:4-7.2(c); 7:4-7.4.

---

[1] "'Encroachment'" means, in the context of this case, "the adverse effect upon any district, site, building, structure or object included in the New Jersey

The Office's determination required the County, pursuant to N.J.A.C. 7:4-7.2(e), to submit an application to the Department for transmittal to the Historic Sites Council (Council), a statutorily-created body within the Department's Division of Parks and Forestry,[2] "for the purpose of recommending policies to the Commissioner for . . . actions [including the] development, use, improvement and extension of historic sites . . .; the . . . protection, preservation, conservation, restoration, and management of all historic sites within the State; and the provision of advice on encroachments."  N.J.A.C. 7:4-1.3; see also N.J.S.A. 13:1B-15.110.  The Council, with four members present, conducted a public hearing at which they reviewed the application.

Hawthorne first contends the meeting was conducted without a legal quorum because having "four out of eleven [members] is most likely not what the [L]egislature would have considered as the right number."  We deem this argument to be without merit.  Although the Council is supposed to consist of

Register resulting from the undertaking of a project by the State, a county, municipality or an agency or instrumentality thereof" as set forth by the applicable criteria and guidelines.  N.J.A.C. 7:4-1.3.

[2] See N.J.S.A. 13:1B-15.108 (designating the Council within the Division of Parks, Forestry and Recreation of the Department of Conservation and Economic Development); N.J.S.A. 13:1D-1 (reorganizing the Department of Conservation and Economic Development into the Department of Environmental Protection).

eleven members, N.J.S.A. 13:1B-15.108, minutes from the meeting reflect the full Board had only six members at that time. We have recognized that under the common law quorum rule, vacancies are not counted in determining if a legal quorum exists; a majority of the remaining members constitutes a quorum. New Jersey Election Law Enf't Comm'n v. DiVincenzo, 451 N.J. Super. 554, 573-574 (App. Div. 2017). The common law rule applies absent a contrary statutory provision. Id. at 574. Hawthorne concedes in its merits brief the "statute does not speak to a required number of members to constitute a quorum." Thus, under the applicable common law rule, four of the six Council members constituted a quorum, as established by the roll call at the meeting.

During the meeting, the Council considered a draft resolution prepared by the Office staff, N.J.A.C. 7:4-7.2(e)(6)(i), and the testimony of County experts and employees. During the public comment portion of the meeting, Hawthorne's borough attorney, the only member of the public to speak, voiced Hawthorne's opposition to the project. Contrary to Hawthorne's argument on appeal, the Council properly evaluated the encroachment, considering all appropriate factors, including: "[t]he public benefit of the proposed undertaking; [w]hether or not feasible and prudent alternatives to the encroachment exist; and [w]hether

4

or not sufficient measures could be taken to avoid, reduce or mitigate the encroachment." N.J.A.C. 7:4-2(e)(6)(ii) to (iv).

The meeting minutes and the resolution prepared by the Office reflect that the County presented evidence relating to all those factors. The Council considered: (1) the park's history, including the pertinent criteria used to determine the park's listing on the New Jersey Register; (2) the prior and present use of the field – formally for football and soccer, informally for other sports and activities – and (3) the benefits of the proposal to change that grass field, extant at the time the park was placed on both the State and National Registers, to a synthetic turf multi-sport field in order to address the dearth of athletic fields in the County. The Council considered testimony that the installation of synthetic turf would resolve the difficulty in properly maintaining the grass field for multiple sports without an adequate water supply, and about the related cost savings in maintenance and manpower. The Council was fully informed of the construction, layout, use and maintenance of the field which was to be lined for football, soccer and lacrosse; and that the County seal would appear prominently at midfield.

According to the minutes, Council members inquired about the availability of alternative sites or fields. Evidence was adduced that the County

owns "only six parks" and "does not have a lot of [c]ounty-owned park land"; Hawthorne has baseball and soccer complexes and dedicated football and lacrosse fields; alternative fields mentioned by Hawthorne's attorney "frequently flood because they are also located in a floodplain"; and the proposed field would be the only County-owned multi-purpose field that can be used for different sports played on the same day because the synthetic turf would not incur the same damage as a grass field. The Council also considered measures to mitigate the encroachment, one of which required dismantling the synthetic turf field and returning the field to its natural state if "a more suitable, non-historic park site for installation of a multi-use synthetic turf field is identified," a task the County engineer deemed feasible.

Three other proposals by the Office, as set forth in the proposed resolution, sought to mitigate the encroachment, see N.J.A.C. 7:4-7.2(9)(ii):

> 1. The County shall plan, develop, and install no fewer than three (3) interpretive wayfinding signs within Goffle Brook Park, which highlight its history. Signage shall include quality reproductions of historic photography of the park and original Olmsted plans in order to visually interpret how it has changed over time. The County shall submit draft text and mockups for the signs, as well as locations proposed for their installation, to the [Office] for review and approval.
>
> 2. The County shall create a display of high quality reproductions of original Olmsted plans in the Rea

House, which is a contributing resource within Goffle Brook Park (and for which a $1.5M rehabilitation is planned.) The signage shall incorporate text regarding the history and development of the park and its association with the Rea House, which shall be reviewed and approved by the [Office] prior to installation. The County shall submit photos of the display after installation of the [Office].

3. The County shall prepare as an amendment to the existing Parks, Recreation and Open Space Master Plan, a Historic Preservation Plan Element, which . . . shall also be incorporated into future master plan updates. The Historic Preservation Plan Element shall identify the historic designed landscapes, buildings, structures, objects, and known archaeological sites within the existing Parks, Recreation and Open Spaces owned by Passaic County and address appropriate treatments for these historic properties in accordance with National Park Service Brief 36 . . . and the Olmsted Center for Landscape Preservation's Guide to Developing a Preservation Maintenance Plan for a Historic Landscape.

Further, a meeting between the County and Office staff resulted in "changes in the [first] proposed design to be more compatible with the original design intent" of the portion of the park in which the field was located: wood light poles installed before the park was listed on the Registers would be removed and not replaced; three non-historic trees in a row planted in the 1980s would be removed; benches and permanent football goalposts would be removed; goalposts and bleachers would be stored except when fields were in

7

use; and a proposed black-coated chain-link fence would be removed from the plans.

The four Council members, at the close of public comment, extensively discussed the resolution after a motion to review same was made and seconded. A vote on the resolution with proposed changes was evenly split among the four members. The resolution was forwarded to the Commissioner.

We disagree with Hawthorne's contention that the Council did not fulfill its duty because the resolution was not passed. Nothing in the regulations requires that the Council's recommendations be unanimous or that they be in the form of a passed resolution. The Council is required only to submit written recommendations to the Commissioner. N.J.A.C. 7:4-7.2(e)(7). Submission of the resolution well-accomplished that duty. The resolution synopsized the evidence presented, including the testimony of the Office staffer, County engineer and parks director, director of the Department of Cultural and Historic Affairs, and Hawthorne's attorney. We further note the Commissioner's designee reviewed the resolution, "comments made by the Council during the meeting[,] and the testimony of the applicant and public," which fully reflected the Council members' disparate recommendations.

A-4347-16T4

The Commissioner's designee considered the Council's split advice and the evidence presented to it and "evaluated the [project's] public benefit; prudent and feasible alternatives; and measures taken to avoid, reduce, or mitigate the encroachment." He authorized the project.

In our limited role in reviewing an administrative agency's actions, we will overturn a decision only if it is arbitrary, capricious or unreasonable. In re Stallworth, 208 N.J. 182, 194 (2011). Administrative decisions are arbitrary, capricious, or unreasonable when: (1) "the agency's action violates express or implied legislative policies"; (2) "the record contains substantial evidence to support the findings on which the agency based its action"; and (3) if, when the law is applied to the facts, the agency clearly erred in reaching its conclusion and its decision is unreasonable. Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995). "[A] court 'may not substitute its own judgment for the agency's even though the court might have reached a different result.'" In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). We will uphold an agency decision even if we disagree with it if it was reached honestly and upon due consideration. Flanagan v. Dep't of Civil Serv., 29 N.J. 1, 12 (1950). Our deference is especially strong when the agency was delegated discretion to determine the "specialized and technical procedures for

its tasks." <u>Newark v. Nat. Res. Council, Dep't of Envtl. Prot.</u>, 82 N.J. 530, 540 (1980). Administrative agencies' interpretations of legal issues, however, do not bind us. <u>Mayflower Sec. Co. v. Bureau of Sec.</u>, 64 N.J. 85, 93 (1973). Under that lens, we determine the assistant commissioner's decision was not arbitrary, capricious or unreasonable.

Hawthorne argues that the Commissioner's designee did not transmit "a written decision with specific reasons therefor" to the applicant. N.J.A.C. 7:4-7.2(e)(9). While the assistant commissioner's letter-decision did not explicitly set forth his reasons, he did attach the resolution from which those reasons can be culled. Furthermore, the record reviewed by the assistant commissioner fully supports his decision. The record presented to and reviewed by the assistant commissioner, as we more fully set forth in our review of the proceedings before the Council, allowed him to weigh the conflicting positions of the parties – and the Council members – and to determine that the encroachment created by the installation of the synthetic turf field warranted authorization subject to the three conditions set forth in the resolution. <u>See</u> <u>In re Applications of N. Jersey Dist. Water Supply Comm'n</u>, 175 N.J. Super. 167, 205 (App. Div. 1980).

The evidence supports that a synthetic turf field filled both the needs of the public by providing a needed multi-sport playing field and by offering a

more cost-effective and viable alternative to a pitch that could not be maintained due to the lack of irrigation. The record also shows there were no viable alternatives, but if one presented, the synthetic turf field could be removed. And the initial steps taken by the County in tandem with the Office, and the three imposed conditions, are evidence of mitigating measures. Hawthorne alleges the mitigating conditions were dubious because they did not relate to the encroachment. Recognizing the Department's "specialized expertise . . . 'to evaluate the factual and technical issues,'" New Jersey League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 222 (1999) (quoting Bergen Pines Cty. Hosp. v. New Jersey Dep't of Human Servs., 96 N.J. 456, 474 (1984)), we defer to the Commissioner's judgment that the conditions were sufficient to avoid, reduce or mitigate the encroachment.

We determine any of Hawthorne's remaining arguments, not here discussed, to be without sufficient merit to warrant discussion in this written opinion. R. 2:11-3(e)(1)(E). We note only that the assistant commissioner, in sending an email to a Hawthorne resident indicating that, when briefed on the project before it was heard by the Council, he was in favor of the staff's recommendation to approve it, expressed only his initial bent. The assistant commissioner said he would review the entire package and would "consider all

11

sides, testimony, positions, etc." He did not decide the case before it was presented to the Council.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION