778 A.2d 546 (2001)
343 N.J. Super. 282
In the Matter of the REGULATION OF OPERATOR SERVICE PROVIDERS.
In the Matter of a Filing by Bell Atlantic-New Jersey, Inc. of a Revision of Tariff B.P.U. No. 2, Exchange and Network Services, Providing for the Introductions of a Customer Provided Pay Telephone Service (CPPTS) Monthly Message Unit Allowance and Reduction of CPPTS Line and Feature Rates.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 2000.
Decided July 27, 2001.
*551 Christopher J. White, Assistant Deputy Ratepayer Advocate, argued the cause for the Division of Ratepayer Advocate, appellant in No. A-919-99/ respondent in A-1728-98 (Blossom A. Peretz, Ratepayer Advocate, attorney, of counsel; Heikki Leesment, Deputy Ratepayer Advocate, and Mr. White, on the brief).
Martin C. Rothfelder Westfield, argued the cause for One Call Communications, Inc., appellant in No. A-1728-98/respondent in No. A-919-99 (Rothfelder Law Offices, attorneys; Mr. Rothfelder and Karen Nations, Baskin Ridge, on the brief in No. A-1728-98; Mr. Rothfelder and Maureen Kehoe Rothfelder, Westfield, on the brief in No. A-919-99).
Carla Vivian Bello, Senior Deputy Attorney General, argued the cause for respondent Board of Public Utilities in both appeals (John J. Farmer, Jr., Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Bello, on the briefs, with Christian Arnold, Deputy Attorney General, in No. A-1728-98).
Wilentz, Goldman & Spitzer, Woodbridge, for respondent Bell-Atlantic New Jersey, Inc. (Hesser G. McBride, Jr., on the brief).
Riker, Danzig, Scherer, Hyland & Perretti, Morristown, for respondent AT & T Communications of New Jersey, Inc. in No. A-919-99 (James C. Meyer, of counsel; Michael A. Schmerling, on the brief).
*552 Before Judges PRESSLER, KESTIN and ALLEY. *547 *548 *549
*550 The opinion of the court was delivered by KESTIN, J.A.D.
These two appeals challenge the validity of N.J.A.C. 14:10-6.3(h), (i), (j) and (n) as adopted by the Board of Public Utilities (Board) in late 1998 to establish current rate caps on alternate operator service (AOS) providers in the telecommunications industry. We consolidate the appeals for the purposes of this opinion.
The provisions at issue establish maximum rates for intrastate telephone calls. N.J.A.C. 14:10-6.3(h) governs those which do not require the intervention of a live operator (0+ calls); N.J.A.C. 14:10-6.3(i) governs those which require the intervention of a live operator (0-calls). N.J.A.C. 14:10-6.3(j) creates an opportunity for AOS companies to make 0+ or 0- rate adjustments if their rates remain below the caps created. In addition to the setting of maximum rates, the Board adopted N.J.A.C. 14:10-6.3(n), which provides for Board "review of the rates to assess the effects of these maximum rates on the [payphone] industry."
Appellants, One Call Communications, Inc. (One Call), and the Division of the Ratepayer Advocate (Advocate) contend that the Board's rate caps and the Legislature's regulation of AOS providers are preempted by federal law. They further claim equal protection standards were violated when only the rates of AOS providers were regulated and not those of all operator service providers (OSPs). Finally, appellants argue that the caps are arbitrary, capricious and unreasonable; that the caps are not supported by the evidence; and that the Board violated the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -24, and other procedural requirements in promulgating the rate regulation.
In A-1728-98, One Call specifically raises the following issues on appeal:
POINT I THE [BOARD'S] FAILURE TO HOLD EVIDENTIARY HEARINGS, TO DECIDE THE CASE BASED ON EVIDENCE AND TO MAKE THE FINDINGS NECESSARY TO SET REASONABLE RATES RENDER THE RATE ORDER AND RATE CAP RULES INVALID.
POINT II THE [BOARD] LACKS JURISDICTION OVER AOS RATES BECAUSE IT FAILED TO TAKE PROCEDURAL STEPS NECESSARY TO LAWFULLY INITIATE SUCH JURISDICTION.
POINT III THE RATE REGULATION IS PREEMPTED BY THE REQUIREMENTS OF SECTION ง 253 OF THE FEDERAL ACT BECAUSE THE RATE REGULATION HAS THE EFFECT OF LIMITING THE PROVISION OF SERVICE BY AOS PROVIDERS AND BECAUSE IT DISCRIMINATES AGAINST AOS PROVIDERS.
POINT IV RATE REGULATION OF AOS PROVIDERS VIOLATES THEIR RIGHTS TO EQUAL PROTECTION OF THE LAWS GUARANTEED BY THE U.S. AND NEW JERSEY CONSTITUTIONS.
In addition to defending the validity of the regulation against One Call's attack, the Board argues that because One Call "failed to participate in the rulemaking proceeding before the Board despite adequate notice and opportunity to comment[,it] should not now be permitted to belatedly raise its concerns nor question the wisdom *553 of the Board's expert factual and policy determinations."
In A-919-99, the Advocate argues:
POINT 1 THE BOARD'S SETTING OF THE CAP AND ITS DECISION TO LIMIT FUTURE INCREASE TO $1.00 IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, HAS NO SUPPORT IN THE RECORD AND IS NOT SUPPORTED BY ANY REASONED DECISION.
POINT 2 THE BOARD'S FINAL RULE ON RATE CAPS VIOLATES THE NEW JERSEY ADMINISTRATIVE PROCEDURE ACT ("APA") IN THAT THE BOARD FAILED TO CONSIDER APPLICABLE FEDERAL STANDARDS.
POINT 3 MATERIAL CHANGES OCCURRED IN THE ASSUMPTIONS SUPPORTING THE EARLIER PUBLISHED NOTICE OF PROPOSED RULEMAKING FOR WHICH A FURTHER NOTICE OF PROPOSED RULEMAKING WAS REQUIRED.
POINT 4 THE BOARD'S RULE RESULTS IN UNJUST DISCRIMINATION AGAINST AOS OPERATORS WHEN OSP OPERATORS CAN CHARGE HIGHER RATES FOR OPERATOR SERVICES.
One Call and the Advocate are also nominal respondents in each other's appeals. Their positions in these connections are variations on the same themes they present in their respective appeals.
A brief overview of terms and industry practices will aid in understanding the regulation and the parties' arguments. We are mindful that a single person or entity can play multiple roles in the processes and relationships described.
A "public pay telephone service (PPTS) provider" is a person or entity offering telephone service to the transient public. A PPTS provider owns the public payphone and is required, among other things, to provide a dial-tone with its telephones and to repair the instruments. A subset of PPTS providers are the "customer provided pay telephone service (CPPTS) providers," which are the customers of record that own and service a payphone, but need to purchase the line, i.e., service, from a local exchange carrier. A CPPTS provider is a non-utility provider of payphones.
An "Aggregator" makes telephones available, in the ordinary course of its business, to the public or to transient visitors of its premises. These telephones include both public payphones and the private pay telephones found in hotels, motels, restaurants, airports, hospitals, and universities. Aggregators receive a commission for all of the calls placed on their phones. These commissions are paid by the telecommunications service providers.
Every private payphone in a hotel, motel, restaurant, airport, hospital, or university has one or more telecommunications companies supplying service to that phone, specifically, long distance service, local exchange service and operator-assisted service. An "interexchange telecommunications carrier" (IXC) is a carrier that provides long distance service in addition to any other local service; whereas a "local exchange telecommunications company" (LEC) provides only local service.
The issues before us concern operator-assisted services on private payphones at aggregator locations. Operator assistance on these phones occurs through live or automated intervention, and it is required for any collect call and for all calls using a credit card or any other third-party billed access card. "0+ calls" are *554 calls in which the caller dials "0" followed, within a few seconds, by the area code and telephone number. "0- calls" are calls in which the end user simply dials "0" followed by no other digits and waits for the operator.
When a caller places a call on these phones by first dialing the specific access code that is associated with the user's billing company, debit card or phone card, such as 1-800-COLLECT for MCI Telecommunications Corp. and 1-800-CALL-ATT for AT&T Communications, Inc. (AT&T), that caller will be connected to the interexchange carrier associated with that number sequence and to the provider of operator-assisted services associated with that interexchange company. When not dialing a specific access number, the caller will be connected to the operator-assistance provider contracted or presubscribed to that phone by the aggregator.
All companies, large or small, that provide such operator-assisted services are called "operator service providers" (OSPs). For example, Bell Atlantic-New Jersey, Inc. (BA-NJ), and AT&T are OSPs in addition to the other roles they discharge in the telecommunications industry.
A subset of OSPs are the AOS providers. Appellant One Call is an AOS provider. Unlike the other OSPs, an AOS provider, such as appellant, is a company that does not itself own the lines, the networks, or the telecommunications facilities; rather, it provides operator-assisted services by separately leasing the use of lines and networks from the local or long distance carriers and then employing its own operators or automated program. An AOS provider is a non-utility provider of operator assistance.
The Federal Communications Commission (FCC) sets forth certain disclosure requirements for all OSPs. New Jersey also has regulations that govern disclosure for all OSPs. N.J.A.C. 14:10-6.1 to -6.8 govern all OSPs, AOS providers and aggregators in New Jersey. In addition to those regulations, PPTS providers are also subject to N.J.A.C. 14:10-9.1 to -9.8.
In late 1998, New Jersey adopted regulations specifically setting a cap on the maximum rates that AOS providers may charge. N.J.A.C. 14:10-6.3. The validity of these rate cap regulations and the legislation on which they are based, N.J.S.A. 48:2-21.22 and -21.23, are at issue in these two appeals.
Some historical and factual background is also needed for contextual understanding. Under the Telecommunications Act of 1934, c. 652, 48 Stat. 1064 (1934) (codified as amended in scattered sections of 47 U.S.C.A. (West 1991 & Supp.2000)), the FCC does not have jurisdiction to regulate intrastate communications services, specifically "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier." 47 U.S.C.A. ง 152(b)(1).
In October 1990, Congress found that the divestiture of AT&T had allowed open entry for competitors into the telephone marketplace and had produced a variety of new services and new providers of telephone services. Congressional Findings at Pub.L. No. 101-435, ง 2, 104 Stat. 986 (1990). The findings noted that a variety of providers of operator services were competing to win contracts with hotels, hospitals, airports, and other aggregators of telephone business. Ibid. Consumers often had "no choices in selecting a provider of operator services, and often attempts by consumers to reach their preferred long distance carrier by using a telephone billing card, credit card, or prearranged access code number [were] blocked[.]" Ibid. The findings reported consumer complaints about being deceived regarding the *555 identity of the company providing operator services for calls and in relation to the rates being charged. Ibid.
Consequently, Congress passed the Telephone Operator Consumer Services Improvement Act of 1990 (TOCSIA), Pub.L. No. 101-435, 104 Stat. 986, 47 U.S.C.A. ง 226 (West 1991 & Supp.2000), setting forth specific disclosure requirements for aggregators and for providers of operator services. 47 U.S.C.A. ง 226(b) and (c). TOCSIA directed the FCC to promulgate regulations to "protect consumers from unfair and deceptive practices relating to their use of operator services to place interstate telephone calls ... [and to] ensure that consumers have the opportunity to make informed choices in making such calls." 47 U.S.C.A. ง 226(d)(1)(A) and (B). In addition, TOCSIA required the FCC to "consider the need to prescribe compensation (other than advance payment by consumers) for owners of competitive public pay telephones for calls routed to providers of operator services that are other than the presubscribed provider of operator services for such telephones." 47 U.S.C.A. ง 226(e)(2). Congress gave the FCC nine months to "reach a final decision on whether to prescribe such compensation." Ibid.
TOCSIA further required each provider of operator services to file and update "an informational tariff specifying [its] rates, terms, and conditions, and including commissions, surcharges, any fees which are collected from consumers, and reasonable estimates of the amount of traffic priced at each rate, with respect to calls for which operator services are provided." 47 U.S.C.A. ง 226(h)(1)(A). TOCSIA also required the FCC to review the rates of all OSPs in order to determine if they were just and reasonable, 47 U.S.C.A. ง 226(h)(2), and authorized the FCC to establish pertinent regulations for its review and regulations that limit "the amount of commissions or any other compensation given to aggregators by providers of operator service." 47 U.S.C.A. ง 226(h)(4)(A). TOCSIA applied only to interstate telecommunications, however. See 47 U.S.C.A. ง 226(a)(2), (4), (7), (8).
Following Congress's lead, the New Jersey Legislature supplemented State law by enacting An Act Concerning Alternate Operator Service Providers (first AOSP Act), L. 1989, c. 337, N.J.S.A. 48:17-23 and -24, effective January 12, 1990. This legislation was enacted to clarify the Board's authority to regulate, on an intrastate basis, the conditions of service pertaining to AOS providers. It required AOS providers, at a minimum, to offer consumers rate quotes upon request and without charge; to inform consumers, before billing, which AOS provider was handling the call; and to allow callers access to other long distance or local exchange carriers, where technically possible. N.J.S.A. 48:17-24a to c. The first AOSP Act also directed the Board to adopt regulations governing operator-assisted services by AOS providers and to adopt a schedule of fines for violations. N.J.S.A. 48:17-24d.
The first AOSP Act defined OSPs as "every telecommunications carrier which provides operator-assisted services." N.J.S.A. 48:17-23. An AOS provider was defined as "a non-facilities based telecommunications carrier who is a reseller leasing lines from local exchange carriers and interexchange carriers and who, using these leased facilities along with their own operators, provides operator-assisted services." Ibid. Operator-assisted services are "services which assist callers in the placement or charging of a telephone call, either through live intervention or automated intervention." Ibid.
AOS providers contract with aggregators to provide operator assistance to the *556 public. An aggregator was defined by the act as "a person or entity, which is not a telecommunications carrier, who in the ordinary course of its business makes telephones available to the public or to transient users of its business, including, but not limited to, hotels, motels, hospitals, or universities, and which provides operator-assisted services through an operator service provider." Ibid.
In 1991, the Legislature enacted the Telecommunications Act of 1992 (State TCA), L. 1991, c. 428, N.J.S.A. 48:2-21.16 to -21.21. Under that act, all IXCs even those that provide operator-assisted services, are exempt from rate regulation and cannot have their rates capped. The State TCA provides that the Board "shall not regulate, fix or prescribe the rates, tolls, charges, rate structures, terms and conditions of service, rate base, rate of return, and cost of service, of competitive services." N.J.S.A. 48:2-21.19a. A competitive service is "any telecommunications service not regulated by the board." N.J.S.A. 48:2-21.17. The State TCA declares that all telecommunications services provided by IXCs are deemed to be competitive services. N.J.S.A. 48:2-21.20a.
On the other hand, as a "safeguard ... to the offering of any competitive service," N.J.S.A. 48:2-21.19e, the State TCA provides that local exchange carriers "shall" only charge a rate for competitive services that "exceed[s] the rates charged to others for any noncompetitive services used by the local exchange telecommunications company to provide the competitive service[.]" N.J.S.A. 48:2-21.19e(2). For these carriers and for all other non-IXC carriers, the Board is "authorized to determine, after notice and hearing, whether a telecommunications service is a competitive service." N.J.S.A. 48:2-21.19b.
Notwithstanding differences in dealing with rates and services, both IXCs and local carriers are required to file and maintain tariffs with the Board for competitive telecommunications services. N.J.S.A. 48:2-21.19a and e(3). Moreover, under N.J.S.A. 48:2-21.20c, the Board is authorized to "establish service quality standards for interexchange telecommunications carriers[.]"
A consequence of the State TCA was that all OSPs were also relieved from any rate regulation. The Legislature explained that it had "acted to exempt competitive telecommunications services from traditional utility regulation [after] finding that such regulation [was] generally not necessary to protect the public interest in the competitive marketplace." N.J.S.A. 48:2-21.22a.
Thereafter, New Jersey consumers began complaining about the rates of AOS providers, that is, "companies which provide operator assistance for collect, third-party billed, and credit card calls, usually at pay phones on the premises of hotels, restaurants, hospitals or airports, with such establishments receiving a commission for calls placed through the AOS arrangement." N.J.S.A. 48:2-21.22b. In its report to the Governor and Legislature on the implementation of the State TCA, the Board "found that where a captive market exists for competitive telecommunications services, market conditions [were] not always able to protect the public interest." N.J.S.A. 48:2-21.22a. However, because of the provisions of the State TCA, the Board was unsure of its "authority to protect consumers' interests with regard to AOS companies." N.J.S.A. 48:2-21.22b.
The Legislature took action, effective July 5, 1995,
to clarify the powers of the board with regard to AOS companies, and to specifically authorize the board to take appropriate action, including, but not limited to, rate regulation, to protect the interests *557 of consumers of alternate operator services upon a finding of the board that such action is necessary to protect the users of those services.

[N.J.S.A. 48:2-21.22c.]
It supplemented the State TCA by An Act Providing for the Regulation of Alternate Operator Service Providers (second AOSP Act), L. 1995, c. 172, N.J.S.A. 48:2-21.22 to -21.23. This legislation clarifies the Board's authority to regulate the rates and terms and conditions of service pertaining to AOS providers. N.J.S.A. 48:2-21.23 states:
Notwithstanding the provisions of [the State TCA] or any other law to the contrary, the Board of Public Utilities, upon a finding by the board that such measures are necessary to protect the users of alternate operator service providers, may regulate the rates and terms and conditions of service of those providers, and use any other means necessary pursuant to law, rule or regulation to protect users of those services.
As used in this section, "alternate operator service provider" means a non-facilities based telecommunications carrier who is a reseller leasing lines from local exchange carriers and interexchange carriers and who, using these leased facilities along with its own operators, provides operator-assisted services.
Contemplating a promulgation of regulations, the Board's Division of Telecommunications began an investigation into the rates charged by OSPs. On August 9, 1995, it sent a letter to all AOS providers as well as payphone vendors using operator services, seeking written submission of all rates, terms and conditions of service applicable to intrastate operator-assisted calls. Specifically, the information was to
include the total charge for each category of service, i.e., collect calls, credit or calling card calls, person-to-person calls, etc. as well as the individual rate elements that comprise the total charge, i.e., operator surcharge, premises imposed fees, mileage and time of day charges, and every other surcharge or fee.
In September 1995, this letter was published in the New Jersey Register. 27 N.J.R. 3306 (September 5, 1995).
The Board received responses from seventy-five AOS and pay telephone providers, which disclosed that their rate schedules ranged from a low equivalent to the rates of a local exchange carrier to a high that was nine times higher, or $9.90 for the same call for which a local exchange carrier would charge $1.10. 28 N.J.R. 68 (January 2, 1996). The Board proposed instituting rate regulation, since the industry was "unable to provide a quality product at reasonable rates absent Board regulation." Ibid.
In January 1996, the Board proposed regulations which, among other things, would impose maximum rates on AOS operators. 28 N.J.R. 68-71 (January 2, 1996). Specifically, the Board proposed to "limit local operator-assisted calls to the rate charged by the incumbent local exchange carrier[,] and [to] cap AOS providers' rates at a rate not greater than $1.00 above the highest applicable operator-assisted rate of tariffed facilities-based carriers." 28 N.J.R. 68. The Board stated that it would notify AOS providers of these maximum rates through publication in the New Jersey Register, and that it would review the maximum rates semi-annually and adjust them, if appropriate. 28 N.J.R. 70.
The proposed rules also allowed at non-coin telephones, i.e., private payphones, additional unlimited surcharges that were "not part of the actual telephone bill" if *558 there was a written notice of those surcharges on the phone. Ibid. In addition, the proposed rules required aggregators utilizing an OSP to place certain consumer information on their telephone instruments; required OSPs to identify themselves as part of a call and to provide rate quotes upon request; prohibited both unauthorized primary interexchange carrier changes and billing that did not reflect the origination of the call; required free access to all OSPs, including local exchange carriers; and included provisions for the completion of emergency calling and for a schedule of fines for violations of the rules. 28 N.J.R. 68. The proposed rules also required AOS providers to file informational tariffs with the Board. Ibid. After a comment period, a public hearing was held on the proposed rules on March 13, 1996. 29 N.J.R. 414 (February 3, 1997).
Meanwhile, in February 1996, Congress comprehensively rewrote the Telecommunications Act of 1934 by enacting the Telecommunications Act of 1996 (federal TCA), Pub.L. No. 104-104, 110 Stat. 56 (1996) (codified in scattered sections of 47 U.S.C.A. (West Supp.2000)). The federal TCA was designed to establish "a pro-competitive, de-regulatory national policy framework" for telecommunications providers. H.R. Conf. Rep. No. 104-458, at 1 (1996). Accordingly, Congress placed significant limitations and preemptions on the states' authority, with certain exceptions. The federal TCA provides at 47 U.S.C.A. ง 253:
(a) In general
No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.
(b) State regulatory authority
Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.
(c) State and local government authority
Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.
(d) Preemption
If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.
The federal TCA deregulates local coin rates for payphones and expressly preempts inconsistent state requirements. 47 U.S.C.A. ง 276 provides:
(b) Regulations
(1) Contents of regulations
In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public, within 9 months after February 8, 1996, the Commission shall take all actions necessary (including any *559 reconsideration) to prescribe regulations thatโ
(A) establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone, except that emergency calls and telecommunications relay service calls for hearing disabled individuals shall not be subject to such compensation;
(B) discontinue the intrastate and interstate carrier access charge payphone service elements and payments in effect on such date of enactment, and all intrastate and interstate payphone subsidies from basic exchange and exchange access revenues, in favor of a compensation plan as specified in subparagraph (A);

* * * *
(D) provide for Bell operating company payphone service providers to have the same right that independent payphone providers have to negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry interLATA calls from their payphones, unless the Commission determines in the rulemaking pursuant to this section that it is not in the public interest; and
(E) provide for all payphone service providers to have the right to negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry intra-LATA calls from their payphones.
(2) Public interest telephones
In the rulemaking conducted pursuant to paragraph (1), the Commission shall determine whether public interest payphones, which are provided in the interest of public health, safety, and welfare, in locations where there would otherwise not be a payphone, should be maintained, and if so, ensure that such public interest payphones are supported fairly and equitably.

* * * *
(c) State preemption
To the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements.
(d) Definition
As used in this section, the term "payphone service" means the provision of public or semi-public pay telephones, the provision of inmate telephone service in correctional institutions, and any ancillary services.
At its meeting in December 1996, the Board voted to adopt its proposed regulations, with minor definition and date changes. See 29 N.J.R. 414-15 (February 3, 1997) (proposal); 29 N.J.R. 464-71 (February 3, 1997) (Adoption and Summary of Public Comments and Agency Responses); 29 N.J.R. 1414-17 (April 7, 1997) (Notice of Action and Order on Adoption). The Board declared that "[t]he information... during the rulemaking proceeding ha[d] not convinced the Board that the rate caps will result in harm to an efficiently operated company." 29 N.J.R. 415. The new regulations stated that the maximum rate AOS providers could charge for intrastate operator-assisted non-local calls at payphones, i.e., toll calls, was "not greater than $1.00 above the highest applicable operator-assisted rate ... of a tariffed facilities-based carrier [i.e., an OSP] *560 on file with the Board on January 1, 1997." N.J.A.C. 14:10-6.3(i). AOS providers were required to file informational tariffs with the Board. N.J.A.C. 14:10-6.3(j). The Board announced that the $1.00 cap would become effective in May 1997, "when the maximum allowable rates are published in the New Jersey Register[.]" 29 N.J.R. 1415.
At the same meeting, the Board also proposed changes to the rate regulation. First, it proposed modifying the rate cap for operator-assisted local calls to no more than "$.50 above the applicable local operator assisted rate of the incumbent local exchange carrier providing service in the affected area." Ibid. Second, the Board announced it was considering a hardship waiver provision "for those providers who can demonstrate that imposition of rate caps causes irreparable harm." Ibid. The test to be applied would be a comparison with the cost structure of an "efficiently run, effectively operated company." Ibid.
In respect of its proposed hardship provision, the Board announced that it was instituting "a formal evidentiary proceeding through which it would obtain[,]" 29 N.J.R. 414, "an objective body of industry data." 29 N.J.R. 1415. The goal was to establish "average bands of costs, expenses, and rates of return so as to gauge" a company's request for a hardship waiver. Ibid. Thus, "any entity providing or utilizing the services of an alternate operator service provider in New Jersey" was ordered to submit, within fifteen days, specifically itemized cost and revenue information. 29 N.J.R. 1416-17.
The New Jersey Payphone Association (NJPA), a group of small and medium sized payphone providers, retained a communications consultant to coordinate, computerize and transmit the data required by the Board. 30 N.J.R. 332 (January 20, 1998). "Thirty-three companies utilized their services and filed with the Board within two weeks of the required filing deadline[,] and one additional company sent its information late." Ibid.
Seven other companies filed responses directly with the Board. Only one OSP, Cleartel, "furnished financial information, of limited value, concerning service in New Jersey. No other OSP serving New Jersey (as disclosed in survey returns) responded. The payphone companies completing the survey form represent approximately 64 percent of total private pay telephones in New Jersey." Ibid. One Call did not respond to the Board's notice.
In a letter to the Board dated January 16, 1997, the NJPA stated that it did "not wish to go through a fact and information gathering process which might not answer all the questions [that the Board] may have." The NJPA indicated it would rather know in advance what information the Board needed for its proceedings.
In conjunction with its review, the Board directed BA NJ and the other local exchange carriers to submit their rates charged for payphone access lines and to describe why the rates for this access differed from the rates of single-line business services. "The intention was to seek disclosure of any unreasonable or any unnecessary costs that [were] currently in rates being charged to payphone operators by local exchange carriers such as BA-NJ." 30 N.J.R. 332. BA-NJ and the two other local exchange carriers operating in New Jersey submitted the required data to the Board. Ibid.
Apparently, because "the maximum allowable rates" were never published in the New Jersey Register, the rate cap regulation as originally proposed never became effective. In January 1998, the Board proposed further changes to the rate caps for AOS providers. 30 N.J.R. 331-34. *561 Specifically, the Board proposed amending N.J.A.C. 14:10-6.3 to add various rate caps depending on the type of operator assistance needed. 30 N.J.R. 333. For intrastate operator-assisted calls which did not require intervention of a live operator, the Board proposed as reasonable a maximum rate of "$2.75 for a five-minute local or non-local call." Ibid. For intrastate operator-assisted calls which required the intervention of a live operator, the Board proposed a maximum rate at "$4.25 for a five minute local or non-local call." Ibid. The rate for live operator calls was indexed to AT&T's rate and could move up as AT&T's rate increased, but not by more than $1.00 (to $5.25), unless the AOS provider sought approval from the Board. Ibid. Additional per minute rates for all calls would be capped at the tariffed rate charged by AT&T. Ibid. The proposal did not include the regulation of person-to-person calls, "since these calls represent less than one percent of all operator assisted calls." Ibid.
The Board also proposed N.J.A.C. 14:10-6.3(n), requiring a review of the rate caps within twelve months and an assessment of their effects on the industry. 30 N.J.R. 334. The proposal did not include a provision for a hardship waiver, however, because it "reduces payphone provider charges from BA-NJ by some 32 percent and significantly increases rates for 0 + calling card calls from the original proposal[.]" 30 N.J.R. 333.
The Board noted that its rate caps were based on: the data submitted by the industry, which had indicated to the Board that there were "some potential negative consequences to certain payphone vendors" under the original rate caps; the Board's discussions with industry representatives, in which its "staff employed alternative dispute resolution techniques" "to strike a balance between the financial integrity of payphone providers and the public interest"; and the Board's anticipation of some industry-wide mitigating factors that would offset any potentially negative consequences of the rate caps. 30 N.J.R. 332.
The Board explained these mitigating factors, stating that they included various potential increases in revenues and reductions in costs to the payphone industry. It was anticipated that increases in revenues would result from FCC action regarding dial-around compensation and the deregulation of local coin rates. Ibid. Reductions in costs would occur from the reduction in LEC payphone access-line rates that were charged to pay telephone providers by BA-NJ. Ibid.
Discussing increases in revenues, the Board first explained that New Jersey's providers could expect increased dial-around compensation, since the FCC had established new rates.[1]Ibid. The Board viewed the usage data submitted by the industry as indicating that "independent payphone providers ... in New Jersey [we]re entitled to approximately $10 million *562 of dial-around compensation annually" and that BA-NJ was entitled to between $30 and $40 million of dial-around compensation annually. 30 N.J.R. 3973 (November 2, 1998).
The Board also explained that New Jersey's providers could now expect higher local coin rates, since the FCC had deregulated such costs. 30 N.J.R. 332. The Board declared that after October 1997, payphone providers were free to charge whatever rates they chose for local coin calls and that, beginning in November 1997, BA-NJ was increasing its local coin call rates from $.20 to $.35. 30 N.J.R. 3973.
Discussing reductions in costs, the Board noted that the following events would soon occur: (1) an average reduction in the BA-NJ line charge to payphone providers of $5.00 per line per month so that it was equal to the business rate; (2) BA-NJ's "inclusion of 75 message units per month to payphone providers which [wa]s equal to the BA-NJ business line tariff," and which amounted to a reduction equivalent to $4.95 per line, per month; and (3) the reduction in BA-NJ tariffed services of 20.03% based on resale discounts. 30 N.J.R. 332-33. The Board announced that "[t]he result of these changes is a reduction of the total local charges from BA NJ ... from $57.00 per phone per month to approximately $38.00 per month. This represents a decrease of about 32 percent to payphone providers." 30 N.J.R. 333.
The Board requested that written comments on the proposed regulations from all interested persons be filed by February 19, 1998. 30 N.J.R. 331.
On October 9, 1998, the Board adopted the regulations, effective November 2, 1998. See 30 N.J.R. 3967-70 (November 2, 1998) (summary of public comments and agency responses). The action was memorialized in a separate order at 30 N.J.R. 3973-75 (November 2, 1998) (the Payphone Order).
Among the regulation's other provisions, the Board adopted three rate caps. (1) For intrastate credit or calling card calls that do not require the intervention or use of a live person, i.e., a "0+" call, the Board set a maximum rate of $2.75 for intrastate calls up to a five minute local or non-local call. See N.J.A.C. 14:10-6.3(h). (2) For operator-assisted calls that require the use or intervention of a live person, i.e., a "0-" call (the most costly calls for independent payphone providers to handle), and for collect calls that used a "voice prompt," the Board indexed the rate to AT&T's rate and set a maximum rate equal to the then AT&T rate of $4.25 for intrastate calls up to a five minute local or non-local call. The rate will increase if AT&T's rate increases, but not by more than $1.00. Therefore, if AT&T's rate exceeds $5.25 ($4.25 plus $1.00), the rate is capped at $5.25, and AOS providers may seek Board approval for rates in excess of $5.25. See N.J.A.C. 14:10-6.3(i)(3). For additional minutes beyond the first five minutes for all calls, the Board set a maximum rate equal to the maximum non-regulated AT&T per minute rate, as determined by AT&T's rate on file with the Board at any particular time, i.e., $0.30 per minute as ordered at 30 N.J.R. 3973. See N.J.A.C. 14:10-6.3(h) and (i). In addition to setting maximum rates, the Board also adopted N.J.A.C. 14:10-6.3(n), providing for agency review of the rates to assess the effects of the caps on the industry.
In its summary of public comments and agency responses, the Board declared that "[a] Federal standards analysis [was] not required because the rules contained in this adoption are not subject to any Federal requirements or standards." 30 N.J.R. 3969.
*563 Additionally, the Board disclosed why it had selected AT&T's rate as the appropriate benchmark for 0- calls:
With respect to the use of AT&T's tariff, the Board used the average rate for each carrier who provided information to the Board and determined that AT&T's was the appropriate rate. AT&T's rate reflects an amount that reasonably approximates the range of rates charged for such services and it can be utilized as a benchmark which each carrier could use as a reference point for its rates.

[30 N.J.R. 3968.]
The Board then noted that after its receipt of the industry's comments on the rate cap proposal and before the Board's adoption of those regulations, AT&T had raised its rates from $4.25 to $5.75 for 0-calls. Ibid.; see also 30 N.J.R. 3974. Since the AOS rate caps were to be indexed to the rates of AT&T, $4.25 at the time the regulation was proposed, it was necessary for the Board to reassess the prudence of its original proposal considering its goal of implementing reasonable AOS rate caps for consumers reflective of market conditions. The Board stated:
[T]he AT&T rates have been adjusted since the publication of the proposal. 0-calls have been increased from $4.25 to $5.75 and the additional per minute charge has been increased to $.30. Therefore, under the rule, if adopted as proposed, AOS providers may charge up to $5.25 for up to a five minute 0-call and $.30 for each additional minute above five minutes for both 0+ and 0-calls. These new AT&T rates continue to be within the range of rates for such services in New Jersey and shall therefore continue to govern the level of AOS rates. Therefore, no change to the proposal is appropriate.

[30 N.J.R. 3968.]
and further explained:
The proposed $4.25 rate [of the rate cap] was indexed to the AT&T rate which was a representative rate charged for operator assisted calls and was considered reasonable and appropriate based upon a review of the varying rates charged for operator assisted calls. The AT&T rate has increased, which permits AOS providers to charge up to the maximum provided in the rule of $5.25, or 24 percent more than originally proposed. The Board is satisfied that the current rates of $2.75 and $5.25 respectfully are reasonable maximum rates which meet the Board's goal of striking a balance between the financial integrity of payphone providers and the public interest. Similarly, the additional per minute of use rate is now $.30 (the current AT&T rate) for 0+ and 0-calls. AOS companies shall have the opportunity to seek Board approval for rates in excess of these maximum rates through established rate adjustment procedures (N.J.A.C.14:1-5.12). The maximum rate for 0-calls is 24 percent higher and additional minute of use charges are in excess of 50 percent higher than that originally proposed. Therefore, they serve to further mitigate any charges or other costs that may be incurred in the payphone industry. Therefore, no change will be made to the rule.

[Ibid.]
The Board observed that the FCC's rate decision on dial-around compensation had been the subject of substantial review in the federal courts and had been remanded to the agency.[2]Ibid. The Board concluded *564 it was of no consequence that dial-around compensation had not yet materialized, since other factors would offset the negative effects of the rate caps. It stated:
As part of its proposal, the Board did describe several circumstances that should mitigate any negative impact of AOS rate caps. The Board expressed its expectation that Federally mandated dial-around compensation will increase over time, offering potential sources of new revenues to the industry. Although challenges and revisions have been made to the Federal dial-around compensation plan, the Board finds no reason to postpone the adoption of the rule set forth herein as the Legislature intended the Board to timely move to protect consumers through rate regulation, if appropriate. There is no reason for this Board to continue to tie rate caps on possible FCC changes to its compensation plan.

[Ibid.]
The Board also noted that the FCC had recently allowed increases to various other federally mandated charges which had not been anticipated in the original rate cap proposal, specifically the new Primary Interexchange Carrier Charges of $2.75 per month per phone and the Universal Access Fund charges of 4.4 percent monthly. Ibid. The Board concluded that these new charges would present a 5.9% revenue decrease to the industry. Nevertheless, the Board declared that this revenue decrease would be offset by the increase in the local coin rates, which would provide independent payphone providers with revenues of $5.6 million. Ibid. The Board explained that its
analysis of local coin rates increasing from 20ข to 35ข, due to Federal deregulation and the fact that this industry's main competitor, BA-NJ, increased its rates to 35ข, will yield an increase in revenues of approximately 17.7 percent.... Therefore, the increase of the coin rate, alone, more than offsets the industry's new Federally mandated [charges]; in fact revenues are anticipated to increase by nearly 12 percent (17.7 percentโ5.9 percent = 11.6 percent). Therefore, while these new FCC mandated charges were not specifically incorporated in the ultimate level of the originally proposed rate caps, the significant additional revenue from local coin calls more than adequately offsets the FCC charges or any revenue decrease associated as a result of the rate caps adopted herein.

[Ibid.]
In addition, in its Payphone Order, the Board reviewed the changes that BA-NJ had proposed to its tariffs: reduction in BA-NJ's CPPTS line rate to payphone providers from $17.50 to $12.96 per line per month in order to make that rate equal to a business line rate;[3] inclusion of seventy-five message units per month to payphone providers, which was equal to the BA-NJ business line tariff and amounted to a reduction of $4.95 per line per month; a reduction of the monthly Line Side *565 Answer Supervision (LSAS[4]) arrangement from $1.65 to $0.15 per CPPTS line; and the elimination of the $1.50 monthly rate for Outward Screening[5] arrangements. 30 N.J.R. 3974-75. The Board concluded that the reduction in BA-NJ's line charges to payphone providers plus the other tariff modifications would lower costs for independent payphone providers. Ibid.
Finally, the Board noted that the Advocate supported the regulation of AOS providers. 30 N.J.R. 3968. According to the Board, the Advocate had declared "that the `imposition of a rate cap on AOSs is needed to protect consumers from paying excessive and unnecessary charges and is therefore in the public interest.'" In addition, the Advocate "agreed that given the reduction in payphone provider charges from Bell by some 32 percent and increases in the rate cap from that originally proposed, there no longer [wa]s a need for a hardship waiver." 30 N.J.R. 3968.
Based upon the foregoing, the Board ordered (1) the adoption of the rate cap regulations and (2) the proposed reductions and changes, on an interim basis, to BA-NJ's tariffs, noting that BA-NJ's tariff reductions and changes needed further review to test for compliance with FCC regulations.[6] 30 N.J.R. 3975. The Board also ordered AOS providers to file, within seven days, informational tariffs showing the rates being charged to consumers. Ibid.
After granting a brief stay to consider NJPA's motion for reconsideration, the Board denied the motion on December 3, 1998. In so ruling, the Board addressed a series of objections that had been made, some of which are before us in this appeal.
Regarding an argument that the rates were preempted by federal law, specifically, 47 U.S.C.A. ง 253(b), the Board noted that the rate caps were premised upon the representative rate of the dominant carrier, AT&T, and that AT&T's rates were "considered reasonable and appropriate based upon a review of the varying rates charged for operator assisted calls." Accordingly, the Board concluded that
with the ability to structure rates equal to or less than the dominant carrier's rates, IPPs [independent payphone providers] have the ability to compete with the dominant carrier for customers. Contentions that the Board's regulations are not competitively neutral are therefore not persuasive. Moreover, they are premature in light of the Board's intention fully set forth below to accelerate its review of the potential impacts of the regulations on the industry. Such a review will reveal whether any adjustments to the regulation are in fact necessary.
With respect to its review of the industry and the timing of that review, the Board stated:
The Board recognizes that information may develop which may demonstrate that the rate caps require modification, although, to date, the industry has not presented any such information. Accordingly, rather than waiting a year *566 before assessing the impact of its regulations on the payphone industry, on its own motion and consistent with our regulatory authority, the Board will immediately initiate an investigation, thereby accelerating its assessment of the impact of the rate caps on the payphone industry.
As for the purpose of the inquiry, the Board's final order defines the investigation as seeking
a thorough understanding of the financial histories of the payphone companies both before and after the approval of rate caps. Of particular concern to the Board are all the changes that have occurred during the years of 1997 and 1998 due to the deregulation of local coin rates and the FCC's imposition of dial around compensation.
To accomplish these ends, the Board required AOS providers "to submit verified income and expense data for the past four years, that is, from 1994 to the present, supplementing" any data that was previously submitted. The Board further commented on the need for an adequate database upon which to evaluate trends on the industry, noting:
On a going forward basis, a reasonable period of time must be allowed to elapse in order to capture the actual revenue impacts caused by various factors, including, but not limited to, those impacts caused by the rate caps which have been in place since November 5, 1998.
Therefore, in addition to requiring the submission of financial data covering the preceding four years, the Board's final order required, for the period January 1, 1997 through October 31, 1999, the industry to submit the following data on a per phone and per month basis, as well as on a total company basis: "local coin rate in effect on the first day of each month;" "the number of local coin calls;" "the average duration of each local coin call;" "local coin call revenue in total and on a per call basis;" "the number of calls eligible for dial-around compensation separated by subscriber 800/888 and access code calls and separated by carrier;" and "the amount of dial-around compensation received, separated by carrier."
Finally, in disposing of the argument that the rate caps would irreparably harm the industry, the Board again reviewed the four sources of increased payphone revenues or decreased costs which it believed "adequately offset any potential revenue decreases which may occur" from the caps: the increase in local coin rates due to FCC deregulation; the FCC's allowance of dial-around compensation; the Board's approval of BA-NJ's proposal to reduce and change its payphone access-line charges; and the Board's reduction of BA-NJ's reseller rates.
As to the first offsetโthe local coin ratesโthe Board determined it was not unreasonable to consider the FCC's deregulation of the local coin rates, since "BA-NJ, the industry's main competitor for local coin calls, had already increased its coin rate, thereby establishing 35ข as the prevailing market rate for coin calls;" other factors such as the potential impact from increased use of prepaid calling cards might have an impact on call volumes; and the Board intended to review its rate cap scheme after one year to determine, among other things, the actual revenue streams available to IPPs, including coin revenue streams, and, if appropriate, to revise its regulations.
Regarding the second offsetโdial-around compensationโthe Board held it was reasonable to consider the increased dial-around compensation even though New Jersey's companies were not yet receiving "`full' compensation." The Board noted that such compensation had been *567 mandated by the FCC and was "already being paid to the payphone industry[.]" It explained further that, in its rule proposal, it had relied on "anticipated" dial-around compensation, recognizing that actual levels of dial-around compensation and the timing of its receipt were within the purview of the FCC, and thus outside of the Board's control. The Board noted, nevertheless, that the industry was "actively asserting its claims to such compensation at the FCC and in the courts." Thus, the Board believed it was reasonable to continue to consider such compensation as a factor mitigating the impact of rate caps, and to revisit the actual levels of dial-around compensation revenues during its contemplated review.
As to the third offsetโBA-NJ's tariff changesโthe Board decided it was reasonable to consider the recent reductions and changes to BA-NJ's CPPTS tariffs even though they were interim in nature and were under review in a proceeding then pending in the Office of Administrative Law to determine conformity with FCC regulations. The Board noted that these changes met its ultimate desire to reduce the charges to the payphone industry, but pointed out, nevertheless, that other changes to BA-NJ's rates had been implemented, such as, "the LSAS reduction of $1.50 per month and the elimination of the $1.50 monthly rate for BA-NJ's Outward Screening arrangement."
In respect of the fourth offsetโBA-NJ's reseller ratesโthe Board determined it was reasonable to consider BA-NJ's rates for services. The Board noted that, in December 1997, it had "approved a wholesale discount of 20.03% [off of BA-NJ's retail services] for those resellers using their own operator services." The Board explained that those savings could be now passed on to the IPPs, and stated that it had already approved a number of agreements between BA-NJ and telecommunication carriers which provided the 20.03% discount.[7] The Board further pointed out that "the NJPA itself, or any other entity, could take steps to help create a reseller entity which could lawfully purchase discounted services from BA-NJ, and from which IPPs could then purchase those services at a discounted rate."
Based on its determinations, the Board found the rate caps reasonable and noted that the NJPA could not "complain of the alleged absence of some revenue streams contemplated either by the Board or its staff, while ignoring, on the other hand, additional and unexpected revenue streams and cost reductions made available either by the Board's rate cap regulations or the Board's CPPTS tariff approval." The Board pointed out that it had raised the rate caps and that there were provisions in the regulations for AOS providers "to request Board approval to put into effect 0-rates in excess of $5.25."
With the denial of NJPA's motion to reconsider, the promulgation of the regulation was confirmed. In the meantime, One Call had filed its appeal from the rule *568 adoption and the Advocate's appeal followed.
We reject the preemption arguments which have been advanced, i.e., that provisions of the federal TCA, 47 U.S.C.A. งง 253(a) and (b) and 47 U.S.C.A. ง 276(a), necessarily preclude the adoption of N.J.A.C. 14:10-6.3(h), (i), (j) and (n) and that these State regulatory provisions in their current version are inherently discriminatory, anti-competitive, and a barrier to market entry. The arguments focus on the wisdom of the Legislature in authorizing the regulation of AOS providers separately from other OSPs in N.J.S.A. 48:2-21.22 and -21.23. We begin by analyzing whether the state statutory scheme is preempted under 47 U.S.C.A. ง 253(d):
If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.
Nothing in that provision suggests that Congress intended to confer self-executing exclusive jurisdiction on the FCC over claims that an order of a state agency or an enactment by a state legislature violates 47 U.S.C.A. ง 253(a) and (b). See, e.g., AT & T Communications of the Southwest, Inc. v. City of Austin, 975 F.Supp. 928, 938 (W.D.Tex.1997); accord MCI Telecommunications Corp. v. Southern New England Tel. Co., 27 F.Supp.2d 326, 334 (D.Conn.1998), contra GST Tucson Lightwave, Inc. v. City of Tucson, 950 F.Supp. 968, 970 (D.Ariz.1996), appeal dismissed, 134 F.3d 377 (9th Cir.1998).
As the court noted in AT & T Communications, supra, 975 F.Supp. at 938, when Congress intended to confer self-executing exclusive jurisdiction on the FCC "over claims arising under other provisions of the [federal TCA], it made its intentions clear in the statute." See, e.g., 47 U.S.C.A. ง 255(f) (access by persons with disabilities) ("The Commission shall have exclusive jurisdiction with respect to any complaint under this section.") and ง 613(h) (same regarding video programming accessibility). On its face, 47 U.S.C.A. ง 253(d), by granting authority to the FCC to act to preempt the enforcement of a state law rule, plainly indicates that, in the absence of specific action by the FCC, no preemption can be deemed to have occurred.
For the same reason, the doctrine of primary jurisdiction has no application here. Section 253(d) may be read only as a mechanism by which the FCC, on its own accord, can raise and adjudicate preemption issues. Thus, that section does not require or even suggest deferring to the FCC where it has not acted. See AT & T Communications of the Southwest, Inc. v. City of Dallas, 8 F.Supp.2d 582, 589 (N.D.Tex.1998) (rejecting the argument that the FCC has primary jurisdiction over ง 253(a) claims). Furthermore, we cannot assume that a telecommunications provider would not have a private cause of action under ง 253(a) if it were being denied entry into a market by a local statute or ordinance. Cf. MCI Telecommunications, supra, 27 F.Supp.2d 326.
The question remains whether 47 U.S.C.A. ง 253(a) and (b) and 47 U.S.C.A. ง 276(a) themselves, facially or operationally, preempt the states from acting in the subject matter area in the manner prescribed by N.J.A.C. 14:10-6.3(h), (i), (j) and (n). We hold that they do not.
The preemption doctrine is rooted in the Supremacy Clause of Article VI *569 of the United States Constitution. Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 674-75 (1982). Congressional intent to preempt State law may be manifested "by express provision, by implication, or by a conflict between federal and state law." New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695, 704 (1995); see Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L. Ed.2d 490, 500 (1983) (Preemption of state law is compelled if the command of Congress is explicitly stated in the federal "statute's language or implicitly contained in its structure or purpose."). Thus, express preemption of state law occurs when Congress has, on the face of a provision, provided a discernible indication of legislative intent to supplant state authority. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407, 423 (1992).
Section 253(a) expressly forbids "State or local statute or regulation, or other State or local legal requirement," from "prohibit[ing] or hav[ing] the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." The preemptive scope of this provision, however, is confined by section 253(b), which expressly limits the preemption of state regulatory authority insofar as it "impose[s], on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of the consumers." We conclude therefore that ง 253(b) "take[s] the form of [a] savings clause[ ], preserving certain state or local laws that might otherwise be preempted under ง 253(a)." Cablevision of Boston, Inc. v. Public Improvement Comm'n of Boston, 184 F.3d 88, 98 (1st Cir.1999).
It is also argued that the State rate caps and legislative scheme at issue here are inherently discriminatory, anti-competitive and a barrier to market entry, specifically violating the "competitively neutral basis" standard of ง 253, which is proffered as pre-emptive. An implicit argument is that the rate caps are defective in these ways because they limit profit and discourage the provision of services. The Advocate specifically claims that the State statutory and regulatory scheme unjustly discriminates against IPPs which use AOS providers, since they are singled out for rate caps while other IPPs who use OSPs are not subject to the rate caps. A correlative argument is that, because of the rate caps, the amount of commission that an OSP can pay to an IPP will be higher than an AOS could pay. The Advocate contends, therefore, that the result is to distort competition and create barriers to market entry for AOS providers. One Call claims that the State scheme discriminates against AOS providers because they are the only OSPs which have their rates capped.
We reject these arguments and the claims they are designed to support. We conclude that the State's legislation and the Board's rate caps do not overstep the grant of authority conferred by ง 253 of the federal TCA taken as a whole and considered in the light of its obvious intent.
The "competitively neutral basis" standard of 47 U.S.C.A. ง 253 is used in only two other sections of the United States Code, 47 U.S.C.A. งง 251 and 254. All three references were added by the federal TCA in 1996. Nowhere, however, is the phrase defined.
*570 Recent federal cases have discussed the term as it is used in one or another of these sections. In US West Communications v. MFS Intelenet, Inc., 193 F.3d 1112, 1120 (9th Cir.1999), cert. denied, 530 U.S. 1284, 120 S.Ct. 2741, 147 L.Ed.2d 1005 (2000), the Ninth Circuit noted that "[t]he FCC has ruled that a mechanism assigning costs based on each exchange carrier's active local numbers is `competitively neutral' [under ง 251(e)(2)], but a mechanism requiring new entrants to bear all the costs of number portability is not." In Cablevision of Boston, a carrier challenged a City of Boston policy regarding the use of underground cable and circuit conduits. In examining the "competitively neutral" requirements of ง 253(c), the court held:
the term "competitively neutral" in ง 253(c) imposesโat mostโa negative restriction on local authorities' choices regarding the management of their rights of way. This means that the statute would not require local authorities to purposefully seek out opportunities to level the telecommunications playing field. If, however, a local authority decides to regulate for its own reasons ..., ง 253(c) would require that it do so in a way that avoids creating unnecessary competitive inequities among telecommunications providers.

[184 F.3d at 105.]
The court assumed that the policy under review resulted in "equivalent notice obligations for all market participant[s]," and satisfied the competitively neutral requirement. Id. at 103.
One Call, in support of its position, cites to In re New England Pub. Communications Council Petition for Preemption Pursuant to Section 253, 11 F.C.C.R. 19,713, 1996 WL 709132 (No. 96-470)(F.C.C.1996) (Dec. 10, 1996). In that case, the FCC conducted a ง 253 preemption analysis regarding a decision of the Connecticut Department of Public Utility Control which prohibited all entities, except incumbent LECs and certified LECs, from providing pay telephone services in Connecticut. Id. at ถ 1. The FCC found that the decision contravened ง 253(a) because it prohibited certain IPPs from providing service and ง 253(b) because it was not facially neutral and not necessary to protect the public safety. Id. at ถถ 18-19, 21.
The rate-cap requirement before us is not facially discriminatory, however; it applies to all AOS providers equally. The concept of competitive neutrality does not require states to treat all providers identically and to ignore significant distinctions among them. TCG Detroit v. City of Dearborn, 977 F.Supp. 836, 840 n. 1 (E.D.Mich.1997), aff'd, 206 F.3d 618 (6th Cir.2000). Moreover, aside from bare assertions, no support has been offered to establish that the regulatory scheme we are here reviewing will impair the ability of AOS providers to compete with OSPs or otherwise hinder them significantly; or that IPPs which use AOS providers will experience significantly greater limitations than IPPs that use traditional OSPs.
No adequate showings have been made even in a more general vein that the rate caps are a bar to market entry or that they negatively affect the ability of any entity to provide telecommunications service. See In re Am. Reliance Ins. Co., 251 N.J.Super. 541, 550, 598 A.2d 1219 (App. Div.1991), certif. denied, 127 N.J. 556, 606 A.2d 369 (1992). In order to prove "dire predictions of financial calamity[,]" appellants must "provide[ ] a factual record substantiating their claims[.]" Ibid.
The Board has committed itself to an examination of the initial effects of the caps, see N.J.A.C. 14:10-6.3(n), and declared in its ultimate ruling on the regulations at issue that it will modify the caps if *571 the data prove that they are a bar to market entry or have undue negative effects on the industry. We have been given no basis, either to reject the Board's determination, based on numerous consumer complaints regarding the fees of AOS providers, that the rate caps are "necessary to... safeguard the rights of the consumers" as required by ง 253(b); or to nullify the corrective measure selected by the Board as well suited to achieve an authorized end. It is clear, in sum, given the adequacy of the Board's findings and the appropriateness of the remedy effected, that the State's legislation and the Board's rate-cap regulations do not impinge upon the scheme envisaged in 47 U.S.C.A. ง 253(a) and (b).
The Advocate argues additionally that the rate caps are unlawful because they are preempted by 47 U.S.C.A. ง 276(c). The specific claim is that the regulations violate that federal statute because IPPs which use AOS providers are singled out for rate caps while other IPPs which use OSPs are not subject to the rate caps. We reject that argument also.
Section 276 is designed to "promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public[.]" 47 U.S.C.A. ง 276(b)(1). It declares specifically: "To the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements." 47 U.S.C.A. ง 276(c).
There are no FCC regulations governing intrastate rates for intrastate telecommunications services. We note further that the federal TCA in 47 U.S.C.A. ง 276(b) deregulated local coin rates for payphones. Accordingly, applying the plain language of the statute, we hold that the regulations before us are not preempted by 47 U.S.C.A. ง 276(c), either.
One Call and the Advocate contend that the Board's rate caps result in invidious discrimination in violation of federal and State equal protection guarantees. See U.S. Const. amend. XIV, ง 1; N.J. Const. art. I, ถ 1; Gardner v. New Jersey Pinelands Comm'n, 125 N.J. 193, 219, 593 A.2d 251 (1991). The argument is that the caps preclude AOS providers from charging identical rates to facility-based OSPs. The equal protection challenge focuses on the Legislature's choice in N.J.S.A. 48:2-21.22 and -21.23 to regulate AOS providers separately from other OSPs.
The equal protection clauses are "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr. Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985). "Equal protection does not preclude the use of classifications, but requires only that those classifications not be arbitrary." Doe v. Poritz, 142 N.J. 1, 91, 662 A.2d 367 (1995). The economic regulations before us are subject to the rational basis test. See Cold Indian Springs Corp. v. Township of Ocean, 81 N.J. 502, 511, 410 A.2d 652 (1980). They are to be upheld if the classification employed reflects a real distinction and if the difference of treatment is "rationally related to a legitimate state interest." Cleburne, supra, 473 U.S. at 440, 105 S.Ct. at 3254, 87 L.Ed.2d at 320. The equal protection guarantee is offended only if the classification is wholly unrelated to the legislative objective. Brown v. Township of Old Bridge, 319 N.J.Super. 476, 506, 725 A.2d 1154 (App.Div.), certif. denied, 162 N.J. 131, 741 A.2d 99 (1999).
In all matters governed by the rational basis test, the Legislature has wide discretion in determining the parameters *572 of a classification. Distinctions may be made with substantially less than mathematic exactitude, and an adequate factual basis for the legislative judgment is presumed to exist. See Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394-95, 72 L.Ed.2d 786, 798 (1982); Barone v. Department of Human Servs., 107 N.J. 355, 365, 526 A.2d 1055 (1987). Especially when the statute is designed to protect the public health, safety and welfare, a heavy burden is placed on the party attacking the classification to show that it clearly lacks a rational relationship to a legitimate state objective. Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 222, 486 A.2d 305 (1985).
By these measures, the equal protection arguments which have been advanced are not persuasive. Facilities-based OSPs and non-facilities based OSPs, i.e., AOS providers, are not similarly situated. There are obvious differences in the existence of facilities if no other.
One Call argues that the Legislative distinction between OSPs based simply on the manner in which they provide service, i.e., owning facilities versus leasing facilities bears no rational relationship to the purpose of protecting the interests of consumers, since telephone users are unable to tell which payphone is provided by a non-regulated OSPโa facilities-based provider, or a regulated OSPโan AOS non-facilities-based provider. One Call claims further that the right of AOS providers to operate their businesses is directly impacted because the rate caps place them at a distinct disadvantage in relation to other OSPs, and that the negative impact on the right to operate a business clearly outweighs the State's interest in protecting the consumers of telephone services.
It is evident on the face of N.J.S.A. 48:2-21.22 and -21.23 that the Legislature's purpose was to protect the public from excessive charges and nondisclosure of rates by AOS providers in particular. See N.J.S.A. 48:2-21.22 (stating that "the board has received many complaints concerning `alternate operator service' (AOS) companies"). Notwithstanding the impact on the interest of the companies involved to operate their businesses as they see fit, capping rates is an effective means to remedy the overcharging of telephone consumers by AOS providers. Thus, a rational relationship to one of the primary general purposes of rate regulation has been established, and the means chosen are rationally suited to achieve the permitted end. Neither the Legislature nor the Board acted improperly in the equal protection sense to remedy directly a specific public policy evil the existence of which had been adequately established. The Board's ongoing review of the effect of the rate cap regulations will address the impact of these provisions on the financial integrity of the AOS industry; and individual inequities will be remediable by the latitude afforded AOS providers to petition the Board for rates in excess of the rate cap for the first five minutes of a 0-call.
The Advocate argues that the rate caps are not rationally related to their implementing statutes and violate applicable federal statutes, because the caps are facially discriminatory and not "competitively neutral." It contends that Congress has specifically prohibited the states from discriminating among the various groups of OSPs.
We note that the FCC has characterized its policies and rules as not prohibiting state regulation of rates. In re Billed Party Preference for InterLATA 0+ Calls, 13 F.C.C.R. 6122, 1998 WL 31845 (No. 92-77) (F.C.C.1998) at ถ 55. Moreover, both the Federal Telecommunications Act of 1996 and the State Telecommunications Act of 1992 are designed to encourage and *573 extend competition in the provision of telecommunications services primarily and specifically for the benefit of the consuming public on the premise that the benefits would flow from a competitively neutral regulatory regime. Neither act can be seen as extinguishing the State's authority to act by way of regulating specific practices to protect the public interest in particular ways. The Board has documented that the public benefits of competition were not being extended to consumers of operator assisted calls from aggregators' pay telephones. The Legislature has concurred and has clarified the Board's authority to regulate the rates of AOS providers upon a finding that such protection of consumers was necessary. N.J.S.A. 48:2-21.22b. The Board made the necessary finding based, inter alia, on its consideration and study of the numerous complaints from consumers. Thus, there was no discrimination in the context of the federal and State telecommunications acts. The result achieved was appropriately designed to deal with a legitimate State interest.
For these reasons, we reject the equal protection arguments advanced by both One Call and the Advocate. Having rejected those arguments, we need not address respondent AT&T's contention that we may not require the Board to cap the rates of facilities-based OSPs, or respondent BA-NJ's argument disputing the Advocate's assertion that it and other entities similarly situated are required to make wholesale discounts available to IPPs.
There is ample reason to reject One Call's procedural challenges to the adoption of the regulations on the ground that it forfeited the right to object by failing to participate in the administrative proceedings which resulted in the promulgation. See Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs., 96 N.J. 456, 474-76, 476 A.2d 784 (1984). Nevertheless, we are faced with the same or similar issues raised in the Advocate's appeal,[8] and the matter is of sufficient public interest to justify waiver of the general rule. Cf. Southern New Jersey Newspapers, Inc. v. Township of Mount Laurel, 275 N.J.Super. 465, 473-74, 646 A.2d 510 (App.Div.1994), aff'd as modified, 141 N.J. 56, 660 A.2d 1173 (1995).
One Call and the Advocate raise various general arguments challenging the regulations and impugning the procedure leading to their adoption. The Advocate contends that the Board's rate-cap adoption is arbitrary, capricious and an abuse of discretion in that there is no support in the evidence for the Board's determinations that the rate caps for 0 + and 0-calls are "fair and reasonable," and that future rate cap increases must be limited to $1.00. One Call also contends that there was no evidence in the record to support the rate caps or the Board's figures.
An administrative regulation is accorded a presumption of validity against a party's challenge that the regulation is arbitrary, capricious, or unreasonable. New Jersey State League of Municipalities v. Department of Cmty. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999). "If procedurally regular, it may be set aside only if it is proved to be arbitrary or capricious or if it plainly transgresses the statute it purports to effectuate ... or if it alters the terms of the statute or frustrates the policy embodied in it." In re *574 Repeal of N.J.A.C. 6:28, 204 N.J.Super. 158, 160-61, 497 A.2d 1272 (App.Div.1985) (citations omitted). See also In re Adoption of N.J.A.C. 13:38-1.3(f) by the State Board of Optometrists, 341 N.J.Super. 536, 542-43, 775 A.2d 629 (App.Div.2001).
Judicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are "particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that ... rulemaking would invite." Bergen Pines, supra, 96 N.J. at 474, 476 A.2d 784; accord Golden Nugget Atlantic City Corp. v. Atlantic City Elec. Co., 229 N.J.Super. 118, 125-26, 550 A.2d 1267 (App.Div.1988). Therefore, the scope of review from the adoption of an administrative regulation is "highly circumscribed," Lower Main St. Assocs. v. New Jersey Hous. & Mortgage Fin. Agency, 114 N.J. 226, 236, 553 A.2d 798 (1989), and a reviewing court is not to substitute its judgment for that of the agency. Dougherty v. Department of Human Servs., 91 N.J. 1, 6, 449 A.2d 1235 (1982).
One Call and the Advocate first argue that the Board failed to apply the correct analysis and make basic findings that the rate caps are "fair and reasonable." They claim that any rate is unreasonable unless the Board considers three factors: the company's property valuation, which constitutes its rate base; the company's expenses, including some allowances for income taxes and depreciation; and the rate of return developed by relating the company's income to the rate base. The Advocate is also critical of the Board "negotiating" the rates with NJPA, the representative of the payphone companies, instead of with the AOS providers themselves.
These arguments misinterpret the applicable law. They rely on particularized factual findings and exceptions prescribed in other statutes, N.J.S.A. 48:2-21, -21.1, and -21.2, applying to franchised public utilities for which traditional rate-base and rate-of-return rate-making is statutorily mandated. We accept the Board's argument that when the Legislature acted to reestablish a degree of rate authority in the Board with respect to AOS providers by enacting N.J.S.A. 48:2-21.22 and -21.23, it was acting to address particular problems and manifested no intention to impose the standards of traditional rate-making upon a non-franchised competitive telecommunications service.
Absent any specific requirement from the Legislature, it was within the Board's discretion to determine that publicly noticed rulemaking was the appropriate vehicle to determine maximum rate caps for AOS providers. We have, where appropriate deferred to the Board on questions implicating its expertise, policy choices and regulatory discretion, see In re Application of New Jersey Bell Tel. Co. (now Bell Atlantic-New Jersey, Inc.) for Approval of its Plan for an Alternative Form of Regulation, 291 N.J.Super. 77, 89-90, 676 A.2d 1133 (App.Div.1996). In the absence of a specific statutory requirement for a hearing on disputed fact, see In re Application of Bell Atlantic-New Jersey, Inc. for Approval of an Extension of its Plan for an Alternative Form of Regulation and for Reclassification of Existing Rate Regulated Services-Directory Assistance Services as Competitive Services, 342 N.J.Super. 439, 776 A.2d 926 (App.Div. 2001), we have opined that "the Board is not obliged to follow any particular formula" in its rulemaking activities. New Jersey Bell Tel. Co. v. State, Dep't of Pub. Utils., 162 N.J.Super. 60, 78, 392 A.2d 216 (App.Div.1978) (citing State v. New Jersey *575 Bell Tel. Co., 30 N.J. 16, 36, 152 A.2d 35 (1959)).
One Call contends further that the regulation was invalidly promulgated because the Board failed to hold an evidentiary hearing as generally required for rate-setting by N.J.S.A. 48:2-21, as well as by the APA and by principles of procedural due process. Specifically, One Call argues there was no meaningful opportunity to be heard and that there was no testimony, public hearing, or open discussion of the issues involved in the matter at the time. It also claims that the Board was required to make factual findings as to whether the rate caps were fair and reasonable.
Our courts normally defer to the agency's choice of proceedings as long as the selection is responsive to the purpose and function of the agency, Texter v. Department of Human Servs., 88 N.J. 376, 385-87, 443 A.2d 178 (1982), and suitable to the determination to be made, see In re Application of Bell Atlantic-New Jersey, supra, 342 N.J.Super. at 442-49, 776 A.2d 926; see also Crema v. New Jersey Dep't of Envtl. Protection, 94 N.J. 286, 299, 463 A.2d 910 (1983) ("Administrative agencies enjoy a great deal of flexibility in selecting the proceedings most suitable to achieving their regulatory aims[,]" and "[a] high degree of discretion in exercising that choice reposes in the administrative agency.") (quoting Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, 85 N.J. 325, 338, 426 A.2d 1000 (1981), and citing N.J.S.A. 52:14F-7 and N.J.A.C. 1:1-2.2(a)).
The proceeding here was not a rate-setting for a particular utility, but rather involved the consideration of a generalized standard to apply to a segment of the telecommunications industry. It was, in short, a quasi-legislative exercise in the most fundamental sense: a rulemaking. The APA does not require the Board to hold evidentiary hearings in connection with a rulemaking. Heir v. Degnan, 82 N.J. 109, 119, 411 A.2d 194 (1980). Under the APA's rulemaking requirements, an agency is required to give at least thirty days' notice prior to the adoption or amendment of a rule. N.J.S.A. 52:14B-4a (1). The agency must give interested persons a reasonable opportunity to submit their views, either orally or in writing, and the agency must "consider fully all ... submissions respecting the proposed rule." N.J.S.A. 52:14B-4a (3). Neither a public evidentiary hearing nor formal "findings of fact" are required, Heir, supra, 82 N.J. at 119, 411 A.2d 194; In re Adoption of N.J.A.C. 10:52-5.14(d)(2) and (3), 276 N.J.Super. 568, 575, 648 A.2d 509 (App. Div.1994), certif. denied, 142 N.J. 448, 663 A.2d 1355 (1995), unless requested by a legislative committee or governmental agency or subdivision, N.J.S.A. 52:14B-4a(3). After receiving and considering submissions from interested parties, the agency must respond in writing summarizing the content of the objections, and providing the agency's response and the reasons for rejecting the objections. N.J.S.A. 52:14B-4a(4).
The procedures followed by the Board here fully complied with the letter and spirit of the APA. The Board offered at least a thirty-day period for interested parties to submit their views and, after receiving comments, it published written responses in the New Jersey Register demonstrating that the comments had been fully considered.
The Board was not ruling upon issues of disputed fact in a contested case. Instead, it was deciding legislative facts and questions of policy in a rulemaking proceeding. No procedure beyond that employed here was required by the APA.
Due process requires adequate notice and the opportunity to present evidence. *576 In re Request for Solid Waste Util. Customer Lists, 106 N.J. 508, 520-21, 524 A.2d 386 (1987). As to what type of proceeding is required to assure fundamental fairness, in High Horizons Dev. Co. v. Department of Transp., 120 N.J. 40, 50, 575 A.2d 1360 (1990), the Supreme Court noted that, in the absence of a specific statutory requirement mandating a hearing, the need for an individual trial-type hearing was influenced by whether the agency was acting in a quasi-judicial capacity or a quasi-legislative capacity. Decisions of the latter variety do not as a general matter require formal trial-type hearings. Id. at 51, 575 A.2d 1360; see also In re Application of Bell Atlantic-New Jersey, supra, 342 N.J.Super. at 443, 776 A.2d 926.
There is no general due process requirement, either, for an evidentiary hearing in a rulemaking. This matter did not center on disputed adjudicative facts, but rather, as we have observed, on the Board's determination of legislative facts and questions of policy during a rulemaking proceeding. In Cunningham v. Department of Civil Serv., 69 N.J. 13, 350 A.2d 58 (1975), the Court distinguished adjudicative and legislative facts as follows:
Adjudicative facts are facts about the parties and their activities, businesses, and properties, usually answering the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law, policy, and discretion.
[Id. at 22, 350 A.2d 58 (quoting Kenneth Culp Davis, The Requirement of a Trial-Type Hearing, 70 Harv. L.Rev. 193, 199 (1956)).]
As in all rulemakings, the Board was at liberty to draw upon its own expertise in setting the rate caps, preeminently a question of public policy with regard to governance of the telecommunications industry. In Golden Nugget, supra, 229 N.J.Super. at 126, 550 A.2d 1267, the court stated:
"Findings may be based on an agency's expertise, without supporting evidence, and findings resting on an agency's expertise may be especially important to the judicial review process when the court does not share the agency's expertise." 3 Davis, Administrative Law ง 14:28 at 126 (2d Ed.1980). This is especially true of determinations which, as here, are "primarily of a judgmental or predictive nature." FCC v. Nat. Citizens Comm. for Broadcasting, 436 U.S. 775, 813, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697, 726 (1978).
Nevertheless, the Board gave AOS providers ample opportunity to present evidence, cost data and comments with respect to the proposed maximum rate caps. Moreover, it has committed itself to an ongoing and expedited review of additional evidence and data from AOS providers so as to gauge the impact of the rate caps. In addition, N.J.A.C. 14:10-6.3(i) allows any AOS provider to present data to the Board on its specific costs of service in an evidentiary rate hearing on the question whether the maximum rates may be exceeded on an individualized basis.
The extensive record compiled by the Board provides ample support for the rulemaking determination it reached. According to the Board, the rate caps at issue were based on the data submitted by the industry; the Board's discussions with industry representatives; and the Board's anticipation of some industry-wide mitigating factors that would tend to offset any *577 potentially negative consequences of the rate caps. 30 N.J.R. 332. Then, in great detail, the Board discussed these mitigating factors and its decision to use AT&T's rate as the benchmark for its rate caps.
The Advocate also claims that the Board's determination to limit future rate cap increases to $1.00 is a naked and unsupported conclusion with no explanation or justification offered as to why $1.00 is more appropriate than some other amount or no limitation at all. This argument ignores the overall history of the development of these rate caps. In its originally adopted version, the rates for non-local calls were capped at $1.00 above the highest applicable operator-assisted rate of a tariffed facilities-based carrier. In their current form, the rates of 0- calls are still capped at $1.00; however, the Board chose the tariffed rates of AT&T as the benchmark.
In its initial adoption of rate caps, the Board discussed the reason it had chosen the $1.00 figure:
The Board's $1.00 cap above the highest applicable operator-assisted rate (including the toll schedule plus the appropriate operator-assistance and any other surcharge) of a tariffed facilities-based carrier on file with the Board, takes into consideration cost differences alleged to exist between different entities in the market. The Board has provided for differences in cost that may exist between different entities, that is, the allowance of a maximum rate that is in excess of tariffed facilities-based carriers was enacted to account for such differences. Contrary to the comments, the maximum allowable operator assisted toll rates are not the rates of AT&T, MCI and BA-NJ, but are in fact in excess of these tariffed carrier's market-based rates by $1.00.

* * *
The Board has determined that a $1.00 cap is appropriate for AOS toll calls, as described in the proposed rules, so as to protect the interests of consumers of these services. The manner in which AOS companies and IPPs apportion the revenues is a business decision between the parties. The Board's concern is that the rate cap is not exceeded.

[29 N.J.R. 466.]
The Board declared further:
For the reasons stated herein [in the summary of comments and agency responses], the Board shall not change the level of the surcharge on operator assisted toll calls, that is, $1.00. The Board believes that the $1.00 surcharge in excess of the highest facilities based carriers' market based rates reflects cost differences between service providers. The information in the record includes a data sampling from 12 companies that completed a request for information and submitted it to an industry association, which does not represent the entire industry. More than one half of the data contained in the sample was from a single pay telephone company. In addition, the general statement by Cleartel and AMNEX that their costs exceed the proposed rates by 3 1/2 to seven times, offers no proof. The statement contains no calculation or verification of any costs allegedly incurred by the commenters. Therefore, the record does not convince the Board that the $1.00 cap for operator assisted toll calls will result in harm to an efficiently run, effectively operated company.

[29 N.J.R. 467.]
Thus, an adequate basis was established for the use of a $1.00 future increase figure, and the initial choice of benchmark is not challenged.
*578 The Advocate also contends that the Board's adoption of the rate caps violated the APA because the Board failed to comply with the federal-standards review requirement of the APA, N.J.S.A. 52:14B-22 to-24.
Administrative rules are not valid unless adopted "in substantial compliance" with the APA. N.J.S.A. 52:14B-4d; Woodland Private Study Group v. Department of Envtl. Prot., 109 N.J. 62, 63-64, 533 A.2d 387 (1987). The APA's federal-standards review requirement provides that, after June 5, 1995, an administrative agency which adopts, readopts or amends a rule or regulation described in N.J.S.A. 52:14B-24, shall
in addition to all the requirements imposed by existing law and regulation, include as part of the initial publication and all subsequent publications of such rule or regulation, a statement as to whether the rule or regulation in question contains any standards or requirements which exceed the standards or requirements imposed by federal law. Such statement shall include a discussion of the policy reasons and a cost-benefit analysis that supports the agency's decision to impose the standards or requirements and also supports the fact that the State standard or requirement to be imposed is achievable under current technology, notwithstanding the federal government's determination that lesser standards or requirements are appropriate.

[N.J.S.A. 52:14B-23.]
In its summary of public comments and agency responses associated with adoption of the rate caps, the Board declared that "[a] Federal standards analysis [wa]s not required because the rules contained in this adoption are not subject to any Federal requirements or standards." 30 N.J.R. 3969.
The Advocate argues that that statement is erroneous, because the applicable federal standards authorizing rate caps on OSPs are set forth in In re Billed Party Preference for InterLATA 0+ Calls, supra, 13 F.C.C.R. at ถถ 52-55, 1998 WL 31845. It further claims that the Board erred by failing to consider whether its proposed rate caps violated 47 U.S.C.A. งง 253 and 276.
Our review discloses that, given the subject matter it was considering, the Board complied with the federal-standards review requirement in adopting the caps because it included a written statement and because there are no specific federal rate cap standards. See Federal Pac. Elec. Co. v. New Jersey Dep't of Envtl. Prot., 334 N.J.Super. 323, 344, 759 A.2d 851 (App.Div.2000) (concluding that DEP complied with the federal standards review requirement in readopting regulations "because it included a written statement, and because there are no federal groundwater standards"). The FCC has stated clearly that its policies and rules do "not preclude, for example, state actions that ... cap OSP rates and related PIFs." In re Billed Party Preference for InterLATA 0+ Calls, supra, 13 F.C.C.R. at ถ 55, 1998 WL 31845.
The Advocate contends further that the Board erred by adopting the rate caps without requesting additional notice and comments addressing material changes in attendant circumstances that occurred after the initial rule proposal and comment period. Specifically, the Advocate points out that one of the mitigating factors the Board relied on to set the capsโthe FCC's dial-around compensationโhad not come into existence by the time of the adoption; that, contrary to the Board's assertion, one of the mitigating factorsโ BA-NJ's reduced reseller ratesโdid not apply to all providers; and that AT&T increased its rates to $5.75, which was *579 higher than the maximum cap proposed and eventually adopted by the Board.
When material changes in the text of a proposed rule occur after initial publication and before adoption of the final rule, the agency must issue and publish further notice seeking comments prior to adoption of the final version of the rule. In re Adoption of Regulations Governing Volatile Organic Substances in Consumer Prods., 239 N.J.Super. 407, 411-12, 571 A.2d 971 (App.Div.1990). "To determine whether re-proposal is required, [a court] must focus on whether the changes destroyed the value of the original notice." In re Adoption of N.J.A.C. 9A:10-7.8(b), 327 N.J.Super. 149, 156, 742 A.2d 997 (App.Div.2000). N.J.A.C. 1:30-6.3 states:
(a) Where, following the notice of proposal, an agency determines to make changes in the proposed rule which are so substantial that the changes effectively destroy the value of the original notice, the agency shall give a new notice of proposal and public opportunity to be heard.
(b) In determining whether the changes in the proposed rule are so substantial, consideration shall be given to the extent that the changes:
1. Enlarge or curtail who and what will be affected by the proposed rule;
2. Change what is being prescribed, proscribed or otherwise mandated by the rule;
3. Enlarge or curtail the scope of the proposed rule and its burden on those affected by it.
(c) Where the changes between the rule as proposed and as adopted are not substantial, the changes shall not prevent the adopted rule from being accepted for filing. Changes which are not substantial include:
1. Spelling, punctuation, technical, and grammatical corrections;
2. Language or other changes, whose purpose and effect is to clarify the proposal or correct printing errors; and
3. Minor substantive changes which do not significantly enlarge or curtail the scope of the rule and its burden, enlarge or curtail who or what will be affected by the rule, or change what is being prescribed, proscribed or mandated by the rule.
There were no changes to the actual regulations proposed by the Board. The final rules are essentially identical to those initially proposed by the agency. Thus, the standards of N.J.A.C. 1:30-6.3, referring to the text of the adopted regulations themselves, were not violated. The public had adequate notice of the agency action, i.e., the rule as actually adopted.
The Advocate contends, however, that material changes which occurred in the assumptions underlying the proposed rule mandated more than was done. We take this argument to embody a contention that the changes regarding the Board's underlying assumptions rendered adoption of the rate caps arbitrary, capricious, and an abuse of discretion. We reject this argument, as well.
As to the mitigation factors cited, the Board expressly stated that the additional sources of revenue that it was relying on were not limited to either dial-around compensation or reseller discounts. It pointed to and discussed the deregulation of local coin revenues and the changes to BA-NJ's other line charges. Furthermore, the adoption was undertaken with the Board's knowledge that actual experiences might dictate future modification of the caps. Indeed, as we have already noted, the regulations themselves provided for a review *580 process and the Board then accelerated this review in order to gauge actual consequences of the caps. Thus, no arbitrariness or caprice was evident in these respects and there was no misapplication of discretion.
The adoption of the rate caps after the change in AT&T's rates was also neither arbitrary, capricious, or an abuse of discretion. The Board stated that it had analyzed AT&T's increase and was satisfied that the caps were still reasonable and met the Board's "goal of striking a balance between the financial integrity of payphone providers and the public interest." 30 N.J.R. 3968. The Board specifically relied on the fact that the rates for 0-calls could be increased an additional $1.00 to $5.25, and it concluded that this $1.00 raise would "serve to further mitigate any charges or other costs that may be incurred[.]" Ibid.
In connection with proposing the rate caps, the Board had received the most up-to-date information from the industry and had analyzed its proposal using that data. It is clear that the constantly changing character of the telecommunications industry and the factual dynamics affecting it render it difficult to propose and adopt any rate cap without expecting some changes in the industry during the time period. Indeed, as a result of industry changes, the Board did accelerate its review of the effect of these rate caps. On the whole, the Board's action in adopting the rate caps notwithstanding the changes in the benchmark rates was within its discretion in determining the standards which would govern in this remaining area of close regulation.
For the reasons stated we affirm the Board's action in promulgating N.J.A.C. 14:10-6.3(h), (i), (j), and (n), including the rate caps on AOS providers contained therein.
NOTES
[1] "Dial-around" compensation is payment by long distance carriers such as AT & T to payphone providers as compensation "for the completion of calls that are otherwise `free' to the caller, such as 800/888 toll free calls[ ] and is intended to compensate the payphone operator for the use of the payphone instrument for calls that it would not otherwise receive payment." 30 N.J.R. 332; 30 N.J.R. 3973. That compensation was authorized under the federal TCA at 47 U.S.C.A. ง 276, and by subsequent FCC action. 30 N.J.R. 3973. "[O]n October 9, 1997, the rate of compensation was set at $.284 per call by the FCC for intrastate and interstate access code and subscriber 800/888 toll free calls." 30 N.J.R. 332. In 1998, the federal courts overturned and remanded that rate to the FCC. See infra, note 2.
[2] The Board noted that the court in MCI Telecomms. Corp. v. Federal Communications Comm'n, 143 F.3d 606, 608-09 (D.C.Cir. 1998), remanded the rate, finding that the FCC had failed to explain and justify its market-based approach. The same court had also overturned the FCC's initial dial-around compensation rate of $0.35 per call, finding that it was arbitrary, capricious and unreasonable. Illinois Pub. Telecomms. Ass'n v. Federal Communications Comm'n, 326 U.S.App.D.C. 1, 117 F.3d 555, 564-65 (D.C.Cir.), clarified on reh'g by 123 F.3d 693 (D.C.Cir.1997), cert. denied sub nom. Virginia State Corp. Comm'n v. Federal Communications Comm'n, 523 U.S. 1046, 118 S.Ct. 1361, 140 L.Ed.2d 511 (1998).
[3] The cost of using BA-NJ's CPPTS line is the largest fixed monthly charge in the provision of payphone service to the public. 30 N.J.R. 3974-75.
[4] LSAS is an optional arrangement whereby a signal is sent to the network interface associated with the customer-provided payphone when the company's facilities detect that the called party's line is off or on the hook. 30 N.J.R. 3974.
[5] Outward Screening arrangements allow person-to-person or station-to-station calls to be completed, but operator-handled calls originating from a CPPTS line are restricted to collect, third number and calling card calls. 30 N.J.R. 3974-75.
[6] The Board's action regarding BA-NJ's tariffs is not directly implicated in this appeal.
[7] BA-NJ argues on appeal that LECs are "not required" to make wholesale discounts available to independent payphone providers. We note the FCC has declared "that independent public payphone providers are not `telecommunications carriers,' ... [and] that incumbent LECs need not make available service to independent public payphone providers at wholesale rates." In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, 11 F.C.C.R. 15,499, at ถ 876, 1996 WL 452885 (August 8, 1996) (No. 96-98), corrected on other grounds, 11 F.C.C.R. 22,301 (Aug. 19, 1996). See also 47 U.S.C.A. ง 251(c)(4)(A) (requiring incumbent LECs to offer for resale, at wholesale rates, any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers).
[8] No issue is raised regarding the timeliness of the Advocate's challenges based on the procedural requirements of the APA. See N.J.S.A. 52:14B-4d ("A proceeding to contest any rule on the ground of noncompliance with the procedural requirements of this act shall be commenced within one year from the effective date of the rule.").